**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**FALL RIVER DYEING & FINISHING CORP., Respondent.**

No. 85–1019.

United States Court of Appeals, First Circuit.

Argued June 6, 1985.

Decided Oct. 18, 1985.

**2.** *See Chardón v. Fernández,* 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981).

Ira Drogin, New York City, with whom Leaf, Sternklar & Drogin, New York City, was on brief for respondent.

William M. Bernstein, Washington, D.C., with whom Elinor Hadley Stillman, Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., were on brief for petitioner.

Before BOWNES, ALVIN B. RUBIN * and TORRUELLA, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge.

The National Labor Relations Board found that Fall River Dyeing & Finishing Corporation (the Company) was the successor to Sterlingwale Corporation, most of whose assets the Company acquired when Sterlingwale became insolvent and was liquidated. The Board also found that a premature demand for collective bargaining made by the Union that had represented Sterlingwale's employees continued in force and became effective against Fall River upon its employment of a representative complement of Sterlingwale employees. Because Fall River, upon reaching its representative complement of employees, did not recognize and bargain with the Union, the Board found that it had violated Section 8(b)(5) and (1) of the National Labor Relations Act. We enforce the Board's order, finding that substantial evidence on the record as a whole supports the Board's conclusions and the legal principles it applied do not violate the Act.

I.

For more than thirty years before 1982, Sterlingwale, which was owned by the Ansin family, operated a plant at Fall River, Massachusetts, in which it engaged primarily in dyeing and finishing textiles. Sterlingwale bought unfinished fabrics for its own account, dyed and finished them, then offered the fabrics for sale to apparel manufacturers. This business is known in the trade as "converting." Sterlingwale also dyed and finished fabrics owned by other customers to the customers' specifications, a business known as "commission finishing." In 1981, sixty to seventy percent of Sterlingwale's volume was converting and the rest commission finishing.

The process for dyeing and finishing fabrics is the same whether the work is done for resale or on commission. However, the financing and customer relations aspects of the two types of businesses are different. Converting requires capital to buy merchandise and a sales force. Several major national firms are engaged in this business, and it is intensely competitive. Commission finishing serves a different market and involves supplying only the services designated by the customer.

Adverse economic conditions and foreign competition afflicted the textile industry in the 1970's. Sterlingwale's business became unprofitable but Ansin, its president and principal stockholder, tried to stay in business because he thought that he "owed that to the community" and to the company's employees, many of whom had been employed by it for over twenty-five years. Early in 1982, after years of losses amounting to millions of dollars, Sterlingwale ran out of cash and could no longer buy fabric for its converting business. Consequently, Ansin ceased normal production operations and began to liquidate the company, laying off employees and selling its inventory. In July 1982, Sterlingwale employed a professional liquidator to sell the firm's remaining assets. Sterlingwale then executed an assignment of its assets for the benefit of its creditors.

Through another company, Arthur Friedman, who is now the President of Fall River, acquired Sterlingwale's equipment

---

* Of the Fifth Circuit, sitting by designation.

and the real property formerly used by it at a mortgage foreclosure sale. Friedman's company conveyed the equipment and leased part of the original Sterlingwale plant to Fall River Dyeing & Finishing.

Fall River, operating out of one of the three former Sterlingwale buildings, began hiring employes on September 20, 1982. The employees then spent approximately four to six weeks on start-up operations, cleaning, relocating and repairing machines. They spent the next four to five weeks on experimental production to ensure that everything was in working order. Following the start-up stage, employees did much the same work they had done for Sterlingwale. The Company conducted all of its operations in what had been Sterlingwale's production building, using the same machinery and the same basic process. It did commission work, as Sterlingwale had done, but did no converter work.

By a letter dated October 19, the union demanded that Fall River recognize it as its employees' collective bargaining agent. The Company replied that it did not intend to comply with the request. At that time, the Company was still engaged in start-up operations, and, as the Board found, did not have a representative complement of employees.

The Company's initial production goal was to have one full shift operation employing fifty-five to sixty employees. Upon reaching that goal, the Company intended to "see how business would be," and planned to expand to a two-shift operation by April 1983. Such a sixteen-hour operation is desirable, indeed almost essential to the production process because the fabrics emerge from the process wet and the entire operation, including drying, cannot be completed in eight hours.

By November 1982, employees had been hired in virtually all job classifications. In mid-January 1983, the first shift was in full operation and the Company had begun a second shift. At that time, the Company had hired at least fifty percent of those it would ultimately employ in the majority of existing job classifications and 55 of the 106–109 employees it was to employ in April, the month in which the Company reached its anticipated employee complement. Of the fifty-five employees hired by mid-January, approximately thirty-six were former Sterlingwale employees. Eight of the Company's twelve supervisors were former Sterlingwale supervisors and three of the other four were former Sterlingwale employees. Over half of the dollar volume of the Company's business came from former customers of Sterlingwale.

The Board found that, as of January 15, 1983, the Company had employed a representative complement of employees in an appropriate unit and that at that time the Company was a successor employer to Sterlingwale. The Board further found that the Union's bargaining request constituted a continuing demand for recognition and bargaining and that the Company violated Section 8(a)(5) and (1) of the National Labor Relations Act[1] by refusing to recognize and bargain with the Union once its successor bargaining obligation arose.

Member Hunter dissented on the ground that the Company did not have a representative complement of unit employees at the time of the Union's October 19 recognition demand and the Company's October 22 refusal. Absent a renewed Union bargaining demand at a time when the Company had reached a representative complement, Member Hunter would find no bargaining obligation.

## II.

■ "[A] mere change of employers or of ownership in the employing industry," the Supreme Court held in *NLRB v. Burns International Security Services, Inc.*,[2] does not affect the Board's certification of a bargaining unit. The successor employer's obligation to bargain is founded on the mandate of Sections 8(a)(5) and 9(a) of the

---

1. 29 U.S.C. § 158(a)(5) & (*l*).

2. 406 U.S. 272, 279, 92 S.Ct. 1571, 1577, 32 L.Ed.2d 61, 68 (1972).

Act[3]—an employer must bargain with "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes."[4] The successor employer's obligation also arises from the rule that a mere change in ownership does not destroy the presumption of continuing employee support for a certified union.[5] "The basic rationale is that a mere change in ownership, without an essential change in working conditions, would not be likely to change *employee* attitudes toward representation."[6] If, after a change in ownership, the essential nature of the enterprise remains unchanged, and a majority of the "new" firm's employees or management were employed by the predecessor company, the new employer is considered the old employer's "successor." As such, the new employer must recognize the incumbent union and deal with it as the bargaining representative of the employees.[7]

In determining whether an employer must recognize and bargain with a union that has represented the employees of the former employer, "the Board looks to the totality of the circumstances to determine whether there has been a substantial and material alteration in the employing enterprises."[8] In making this determination, the Board considers various factors, among them the percentage of employees who were employed by the previous employer, the extent to which their former supervisors have been retained, the identity of skills used and functions performed by the employees, the continuation of the business in the same physical facility with the same or similar equipment, the continuity of products sold or services rendered, and the identity of the customers.[9] Significant changes in the scope of the new employer's business are to be considered, but alone they do not negate the possible successorship status of the new business.[10] The critical inquiry is whether any changes in operation have significantly altered the employees' working conditions, the employment relationship, and correspondingly, the employees' expectations and needs with regard to representation.[11]

The seven-month hiatus between the cessation of production at Sterlingwale and the commencement of the Company's operations is to be considered, but it is similarly not dispositive.[12] A hiatus does not of itself preclude a successorship finding because the inquiry focuses on employee expectations of rehire in the light of indications during this interim of plans to resume plant operations under new management. The interim period may be viewed as part of "the normal concomitants of a new management and a new approach to a failing business, not a break in the continuity of the employing industry."[13]

3. 29 U.S.C. §§ 158(a)(5) & 159(a).

4. *Id.* § 159(a).

5. *See NLRB v. Burns Int'l Sec. Servs.,* 406 U.S. at 277–79, 92 S.Ct. at 1577, 32 L.Ed.2d at 67–68; *see also Aircraft Magnesium,* 265 N.L.R.B. 1344, 1345 (1982), *enforced,* 730 F.2d 767 (9th Cir. 1984) (table).

6. *Premium Foods, Inc. v. NLRB,* 709 F.2d 623, 627 (9th Cir.1983) (emphasis in original); *see NLRB v. Band-Age, Inc.,* 534 F.2d 1, 6 (1st Cir. 1976), *cert. denied,* 429 U.S. 921, 97 S.Ct. 318, 50 L.Ed.2d 288 (1976).

7. *NLRB v. Burns Int'l Sec. Servs.,* 406 U.S. at 279–81, 92 S.Ct. at 1577–79, 32 L.Ed.2d at 68–69; *NLRB v. Band-Age, Inc.,* 534 F.2d at 3.

8. *NLRB v. Boston Needham Indus. Cleaning Co., Inc.,* 526 F.2d 74, 77 (1st Cir.1975).

9. *See NLRB v. Burns Sec. Servs., Inc.,* 406 U.S. at 279–80 n. 4; 92 S.Ct. at 1578 n. 4; 32 L.Ed.2d at 68–69 n. 4; *NLRB v. Middleboro Fire Apparatus, Inc.,* 590 F.2d 4, 7–8 (1st Cir.1978); *NLRB v. Band-Age, Inc.,* 534 F.2d at 3–4, 6 (1st Cir.1976).

10. *NLRB v. Jeffries Lithograph Co.,* 752 F.2d 459, 463, 465–66 (9th Cir.1985); *NLRB v. Hudson River Aggregates, Inc.,* 639 F.2d 865, 869 (2d Cir.1981).

11. *See NLRB v. Band-Age, Inc.,* 534 F.2d at 6; *NLRB v. Boston Needham Indus. Cleaning Co., Inc.,* 526 F.2d at 77; *NLRB v. Jeffries Lithograph Co.,* 752 F.2d at 464.

12. *NLRB v. Band-Age, Inc.,* 534 F.2d at 5.

13. *NLRB v. Middleboro Fire Apparatus,* 590 F.2d at 8.

Because the enterprise-continuity determination is based on the totality of circumstances, decisions turn "to a great extent on the precise facts involved." [14] A reviewing court's inquiry is limited to whether the Board's findings are supported by substantial evidence, viewing the record as a whole. [15]

■ The Board's finding in this case that the Company was substantially continuous to Sterlingwale is supported by substantial evidence in the record, considered as a whole, as the evidence summarized above demonstrates. The Company did not assume Sterlingwale's liabilities or acquire its trade name but these facts do not preclude a finding of successorship. [16] Although the Company operated exclusively as a commission dyer and finisher and did not continue the converter work performed by Sterlingwale, this change did not alter the essential nature of the employees' responsibilities because both types of work involve essentially the same production process. The differences between the Company's business and Sterlingwale's are not sufficiently significant to require a finding that the continuity of the enterprise, viewed from the employees' standpoint, was broken. The changes in purchasing, sales, marketing, and financial operations brought about by the switch to a straight commission operation are only indirectly related to the interests of the unit production and maintenance employees. [17] The change from three shifts to two and the reduction in the number of supervisors might rationally be found to represent only a reduction in the size and scope of the operation, not an essential change in the employing enterprise.

## III.

■ In a successorship situation, the bargaining obligation can normally be determined at the time of transfer or when operations begin. [18] In other instances, however, such as when an employer is rebuilding a collapsed business or is operating at a substantially reduced capacity, a delay in making the determination may be appropriate. As the Supreme Court has noted, a determination regarding the successor's obligation to bargain may have to wait "until the successor employer has hired his full complement of employees . . ., since it will not be evident until then that the bargaining representative represents a majority of employees in the unit as required by § 9(a) of the Act." [19]

This "full complement" principle, however, has not been interpreted to require that the examination of the workforce composition be postponed until the business is operating at its maximum capacity or until the employer has completed hiring all of its bargaining unit employees. Courts have agreed that, in cases in which the successorship obligation cannot be determined at the very outset of the transition, fixing the appropriate date at which the bargaining obligation arises "involves balancing the objective of insuring maximum employee participation in the selection of a bargaining agent against the goal of permitting

14. *Howard Johnson Co. v. Detroit Local Joint Executive Bd.,* 417 U.S. 249, 256, 94 S.Ct. 2236, 2240, 41 L.Ed.2d 46, 53 (1974) (quoting *NLRB v. Burns Int'l Sec. Servs.,* 406 U.S. 272, 274, 92 S.Ct. 1571, 1575, 32 L.Ed.2d 61, 65 (1972)). *See also International Union of Elec., Radio & Mach. Workers v. NLRB,* 604 F.2d 689, 694 (D.C.Cir. 1979).

15. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456, 468 (1951); *NLRB v. Middleboro Fire Apparatus, Inc.,* 590 F.2d at 6; *NLRB v. Boston Needham Indus. Cleaning Co., Inc.,* 526 F.2d at 76.

16. *Cf. NLRB v. Band-Age Inc.,* 534 F.2d at 5; *Tom-a-hawk Transit, Inc. v. NLRB,* 419 F.2d 1025, 1026–27 (7th Cir.1969).

17. *See NLRB v. Interstate 65 Corp.,* 453 F.2d 269, 273 (6th Cir.1971).

18. *NLRB v. Hudson River Aggregates, Inc.,* 639 F.2d 865, 870 (2d Cir.1981); *see also NLRB v. Ideal Laundry Corp.,* 422 F.2d 801, 804 (10th Cir.1970).

19. *NLRB v. Burns Sec. Servs., Inc.,* 406 U.S. at 295, 92 S.Ct. at 1586, 32 L.Ed.2d at 77.

employees to be represented as quickly as possible."[20]

These interests are effectively reconciled in the "substantial and representative complement" standard applied by the Board in this case.[21] This "standard embodies the balance between early representation and maximum participation that lies at the heart of the 'full complement' concept,"[22] and it has met with general acceptance in courts that have considered this type of successorship problem.[23]

The Company's contention that the Board's representative complement standard is "at variance with the Ninth and Tenth Circuits" is not supported by the cases cited. In *Pacific Hide & Fur Depot, Inc. v. NLRB*,[24] the Ninth Circuit declined to enforce the Board's order to bargain in part because it read the Board's decision in that case as rejecting altogether the proposition that the *Burns* "full complement" dictum was relevant to the question whether a successorship obligation exists. While the court implied in dicta that strict adherence to the "full complement" standard was proper, it also recognized that a "full complement" could be defined "only by considering the facts of each case" in the light of the general goals to be attained.[25] The Ninth Circuit has since made clear its acceptance of the "substantial and representative complement" standard as an appropriate means of satisfying the interests recognized in *Burns*.[26] Similarly, in *NLRB v. Pre-Engineered Building Products*,[27] the Tenth Circuit, while it declined to enforce the Board's order on the basis of the record evidence, rejected a rigid interpretation of the "full complement" standard that would postpone the obligation to bargain until the employer achieved its ultimate objectives and acknowledged the necessity of balancing the objectives of early representation and maximum employee participation.[28]

In determining whether a representative complement existed at a given date, the Board first looks to see whether the job classifications for the operation were "filled or substantially filled" and whether the operation was in "normal or substantially normal production."[29] The Board also considers the size of the complement on that date, the time expected to elapse before a substantially larger complement would be hired, and the relative certainty of the expected expansion.[30]

Considering these guides, the Board reasonably found that the Company employed a substantial and representative complement of its workforce in mid-January. By then the Company had hired employees in virtually all job classifications, had hired at least fifty percent of those it

**20.** *NLRB v. Pre-Engineered Bldg. Prods., Inc.*, 603 F.2d 134, 136 (10th Cir.1979); *accord Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 628 (9th Cir.1983); *NLRB v. Hudson River Aggregates, Inc.*, 639 F.2d at 870–71.

**21.** *See, e.g., Indianapolis Mack Sales and Serv., Inc.*, 272 N.L.R.B. No. 108, 117 L.R.R.M. 1335 (1984); *enforcement appeal filed*, No. 84–3061 (7th Cir. Dec. 7, 1984); *Aircraft Magnesium*, 265 N.L.R.B. 1344, 1345 (1982), *enforced*, 730 F.2d 767 (9th Cir.1984) (table).

**22.** *Premium Foods, Inc. v. NLRB*, 709 F.2d at 628.

**23.** *NLRB v. Jeffries Lithograph Co.*, 752 F.2d at 467; *NLRB v. Hudson River Aggregates, Inc.*, 639 F.2d at 870; *see also NLRB v. Pre-Engineered Bldg. Prod., Inc.*, 603 F.2d at 136 & n. 1 (10th Cir.1979).

**24.** 553 F.2d 609 (9th Cir.1977).

**25.** *Id.* at 613.

**26.** *See NLRB v. Jeffries Lithograph Co.*, 752 F.2d 459, 467 (9th Cir.1985) (citing *Premium Foods, Inc. v. NLRB*, 709 F.2d 623, 628–29 (9th Cir. 1983)).

**27.** 603 F.2d 134 (10th Cir.1979).

**28.** *Id.* at 136.

**29.** *Premium Foods, Inc. v. NLRB*, 709 F.2d at 628; *accord NLRB v. Jeffries Lithograph Co.*, 752 F.2d at 467 (9th Cir.1985); *Indianapolis Mack Sales and Serv., Inc.*, 272 N.L.R.B. No. 108, 117 LRRM 1335 (1984), *enforcement appeal filed*, No. 84–3061 (7th Cir. Dec. 7, 1984); *see also Hayes Coal Co., Inc.*, 197 N.L.R.B. 1162, 1163 (1972).

**30.** *NLRB v. Jeffries Lithograph Co.*, 752 F.2d at 467–68; *Premium Foods, Inc. v. NLRB*, 709 F.2d at 628.

would ultimately employ in the majority of those classifications, and it employed a majority of the employees it would eventually employ when it reached full complement. No workers having new skills were later employed. The Company had also reached substantially normal production in mid-January, at which time the first shift was in full operation and a second shift had begun.

### IV.

■ In successorship situations, when a union's clear request for bargaining in an appropriate unit has been rejected outright and unconditionally by the employer, the Board has treated the demand as continuing and has not required the union to renew the demand later, even if the employer's bargaining obligation was not mature at the time of the original request.[31] The Board has applied this doctrine in cases in which a union, lacking a majority at the time of its original demand, did not renew the demand upon gaining a majority [32] and in cases in which an employer, seeking to defend against an unfair labor practice charge, asserts the charge is barred by the Act's statute of limitations [33] because of the union's failure to renew its demand within six months of the charge's filing.[34]

The Company argues, however, that the Third Circuit's rejection of the continuing demand concept in *Hedstrom Co. v. NLRB* [35] controls the present case. In *Hedstrom,* a case not involving a successor enterprise, the initial demand was made by a union lacking majority support. The court reasoned that to recognize as continuing a demand made when the union lacked majority designation would force employers "to tread the fine line between" [36] violating Section 8(a)(2) of the Act,[37] which prohibits recognizing a minority union, and violating Section 8(a)(5) of the Act,[38] which requires employers to bargain with the majority union. Under the circumstances present in *Hedstrom,* if the initial immature demand were to be deemed continuing, the employer's obligation to bargain would arise simply upon the union's reaching majority status. Such a rule would require an employer to monitor the union's status in order to avoid violating Section 8(a)(5) of the Act.

The rationale of *Hedstrom* is nullified in successorship cases. When a continuity in the enterprise has been found, as is the case here, "the presumption of majority status by the union under the predecessor ... is not affected by a change in ownership." [39] "A union is not required to substantiate anew its majority status when a successor assumes an employer's business." [40] The rationale behind this presumption of majority status derives from the fact that a successor's obligation to bargain with the union arises when the employer reaches a "substantial and representative complement" of its work force.[41] The employer, unlike the union, can readily reach this determination on its own by examining whether the job classifications for the operation have been "filled or substantially filled" and whether the operation is in

---

**31.** *Aircraft Magnesium,* 265 N.L.R.B. 1344, 1345 n. 9 (1982), *enforced,* 730 F.2d 767 (9th Cir.1984) (table).

**32.** *Schwab Foods, Inc.,* 223 NLRB 394, 413 (1976), *enforced* 549 F.2d 805 (7th Cir.1977) (table); *Local No. 152 v. NLRB,* 343 F.2d 307, 310 (D.C.Cir.1965).

**33.** National Labor Relations Act § 10(b); 29 U.S.C. § 160(b).

**34.** *Enterprise Prods. Co.,* 265 NLRB 544, 563 (1982).

**35.** 558 F.2d 1137, 1146–48 (3rd Cir.1977), *cert. denied,* 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981).

**36.** *Id.* at 1148.

**37.** 29 U.S.C. § 158(a)(2).

**38.** *Id.* § 158(a)(5).

**39.** *Aircraft Magnesium,* 265 N.L.R.B. 1344, 1345 (1982), *enforced,* 730 F.2d 767 (9th Cir.1984) (table).

**40.** *Id.* at 1346.

**41.** *See supra* text accompanying notes 19–30.

"normal or substantially normal production." [42] Thus, in the successorship context, the continuing demand concept does not present the risks the *Hedstrom* court found unfair.

In the successorship context, moreover, the Board's continuing demand rule is practical. Unions often lack precise information about when a change in ownership of a firm is to take place, how it is to take place, and what plans, if any, the new owners have for expansion or modification of the enterprise; it is thus not uncommon for bargaining demands to be made before the bargaining obligation actually arises. [43] In none of the successorship cases was it even claimed that the Board could not properly find a Section 8(a)(5) violation because the initial bargaining demand was not renewed, and the Company has cited no successorship case that supports that proposition.

The doctrine applied by the Board may not be one that we would ourselves devise. Given the discretion imparted to it to interpret and enforce the Act, we do not find the Board's ruling "arbitrary or contrary to law." [44]

## V.

■■■ At the unfair labor practice hearing, the Company sought to introduce two petitions disclaiming employee support for the Union. The petitions had been signed by the employees on April 29, 1983, three days before the unfair labor practice hearing commenced. The administrative law judge rejected these exhibits because,

given their timing, they could not justify the Company's refusal to bargain on January 15. The administrative law judge properly declined to consider the petitions on the ground that they were made after the time when the Company became obligated to bargain with the Union and failed to do so. As in the analogous situation of an employer withdrawing recognition from a union because it in good faith doubts the union's majority status, no useful purpose is served by permitting the employer to defend the propriety of an earlier refusal to bargain by relying on subsequent events that had nothing to do with the refusal. [45] Furthermore, once it has been determined that an employer has unlawfully withheld recognition of an employees' bargaining representative, the employer cannot defend against a remedial bargaining by pointing to an intervening loss of employee support for the union when such loss of support is a foreseeable consequence of the employer's unfair labor practice. [46]

Had the Company voluntarily bargained with the Union in January, the employees' wage concerns might have been addressed and the employees might not have signed these petitions. If the employees had nonetheless signed petitions disclaiming support for the Union after such bargaining, the Company might have had a basis for withdrawing recognition; having behaved lawfully, it would be free to withdraw recognition on the basis of any evidence that established actual loss of majori-

---

42. *Premium Foods, Inc. v. NLRB,* 709 F.2d at 628; *see also Hayes Coal Co., Inc.,* 197 N.L.R.B. 1162, 1163 (1972).

43. *See, e.g., NLRB v. Hudson River Aggregates,* 639 F.2d at 867–68, 870 (2d Cir.1981); *Aircraft Magnesium,* 265 N.L.R.B. 1344, 1344–45, 1346 (1982), *enforced,* 730 F.2d 767 (9th Cir.1984); *cf. Premium Foods, Inc. v. NLRB,* 709 F.2d at 625–26, 629 (though union demand timely, sent to wrong company also involved in the transfer).

44. *Charles D. Bonanno Linen Serv., Inc. v. NLRB,* 454 U.S. 404, 413, 102 S.Ct. 720, 725, 70 L.Ed.2d 656, 664 (1982); *see also Beth Israel Hosp. v. NLRB,* 437 U.S. 483, 501, 98 S.Ct. 2463, 2473–74, 57 L.Ed.2d 370, 385 (1978) ("The judi-

cial role is narrow: The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced.").

45. *See Terrell Machine Co. v. NLRB,* 427 F.2d 1088, 1090 (4th Cir.), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970); *NLRB v. Gulfmont Hotel Co.,* 362 F.2d 588, 589 (5th Cir. 1966).

46. *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 702–04, 64 S.Ct. 817, 818, 88 L.Ed. 1020, 1022–23 (1944).

ty or supported good faith doubt.[47] However, the Board found the Company did not bargain when it should have; hence, these petitions cannot properly serve either to justify the earlier refusal to bargain or to affect the order remedying that refusal.[48]

For these reasons, the Board's order is ENFORCED.

TORRUELLA, Circuit Judge (Dissenting).

The central issue presented by this appeal is whether the National Labor Relations Board (Board) has contravened *N.L.R.B. v. Burns International Security Services,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) in ruling that Fall River is a "successor employer" to Sterlingwale and was thus bound to recognize and negotiate with the labor organization that represented Sterlingwale's employees. Underlying the resolution of this question are two Board-promulgated theories: (1) the "continuing demand" concept, whereby a union's demand for recognition, once made and rejected by an employer, is considered to be continuing in nature, *see Aircraft Magnesium,* 265 N.L.R.B. 1344, 1345 n. 9 (1982), enforced, 730 F.2d 767 (9th Cir. 1984), and (2) the "substantial and representative complement" standard, under which the determination of whether a new employer is a successor is postponed until his workforce reaches a substantial complement, representative of the number and type of employees that will ultimately constitute the appropriate bargaining unit. *Aircraft Magnesium,* 265 N.L.R.B. at 1345; *Premium Foods, Inc. v. N.L.R.B.,* 709 F.2d 623, 628 (9th Cir.1983). These issues are unavoidably intertwined and are of first impression in this circuit.

At the outset, it must be recognized that "[t]he judicial role is narrow: The rule[s] which the Board adopts [are] judicially reviewable for consistency with the Act, and for rationality, but if [they] satisf[y] those criteria, the Board's application of the rule[s], if supported by substantial evidence on the record as a whole, must be enforced." *Beth Israel Hospital v. N.L.R.B.,* 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978). *See also* § 10(e), N.L.R.A., 29 U.S.C. § 160(e); Administrative Procedure Act, 5 U.S.C. § 706(2)(E); *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In my opinion the Board has failed to meet all of these tests and is promoting concepts that are clearly contrary to the Labor Management Relations Act (Act) and to Supreme Court precedent.

In the area of successorship there are few broad governing principles and thus, there exists considerable uncertainty. *N.L.R.B. v. Band-Age, Inc.,* 534 F.2d 1, 2 (1st Cir.1976). *See also* Note, *The Bargaining Obligations of Successor Employers,* 88 Harv.L.Rev. 759, 760 (1975) (hereinafter cited as *Bargaining Obligations* ); Comments, *Criteria For Determining Employer Successorship-Factor Analysis, Burns and the Need For a New Standard,* 11 Wake Forest L.Rev. 437, 446, 457 (1975) (hereinafter cited as *Criteria* ). In light of the difficulty of the successorship question, it is especially appropriate to focus on the particular facts of each case. *Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees Union,* 417 U.S. 249, 256 (1974); *Band-Age, Inc., supra.*

In the present case, the facts upon which the Board's action is predicated are essentially undisputed. I will restate them, however, in the context of various items apparently glossed over by the Board in reaching its successorship conclusion.

On February 12, 1982, Sterlingwale shut down its textile dyeing and finishing operation and indefinitely laid off all of its production and maintenance employees. These employees were represented since 1968 by the United Textile Workers of

---

**47.** *Landmark Int'l Trucks, Inc. v. NLRB,* 699 F.2d 815, 819 (6th Cir.1983); *Harley-Davidson Transp. Co.,* 273 N.L.R.B. No. 192, 118 L.R.R.M. 1204 (Jan. 22, 1985).

**48.** *Aircraft Magnesium,* 265 N.L.R.B. 1344, 1346 (1982), *enforced,* 730 F.2d 767 (9th Cir.1984).

America, AFL–CIO, Local 292 (Union). A series of collective bargaining agreements had been negotiated, the last of which was due to expire on April 1, 1982, and eventually did so expire without further extension by the parties. Notwithstanding the existence of a grievance and arbitration procedure, the Union did not challenge Sterlingwale's actions, as it was patently clear that the terminations were not motivated by anything except Sterlingwale's dire economic circumstances involving the loss of millions of dollars.

After February 12th, Sterlingwale entered a period of liquidation during which it retained a skeleton crew until the Summer of 1982, when the business ceased activities altogether. An assignment was made for the benefit of creditors and a foreclosure was made on the premises occupied by Sterlingwale. Thereafter, Sterlingwale's property was sold at auction. The real property was acquired in late August 1982 by Macramy Sales Corp. (Macramy), who then leased part of these premises to Fall River. Fall River moved into this locale in September 1982. Fall River also acquired at auction most of Sterlingwale's machinery, furniture, and fixtures, and part of Sterlingwale's remaining materials and inventory. It is significant to note that these purchases were made *at public auction,* not through direct private sales.

Fall River acquired no other former Sterlingwale assets such as its trade name, good will, or customer lists, nor did Fall River assume any of Sterlingwale's liabilities. Additionally, there is no evidence that Fall River obtained any of Sterlingwale's employee lists or personnel records.

Thereafter, Fall River publicly advertised employment opportunities in the local newspapers. On September 20, 1982, after hiring its first new employees, it commenced preliminary start-up operations in one of three former Sterlingwale buildings. Fall River proposed to engage solely in commission work, which consists of the dyeing and finishing of fabric belonging to others for a commission, in contrast with Sterlingwale, whose business had been approximately 60–70% processing its own fabric and only 30–40% commission finishing.

On *October 19, 1982,* the Union sent Fall River a letter stating that, "pursuant to the Agreement between Sterlingwale" and the Union, the Union demanded recognition. It then indicated that on October 28th at 1:00 PM a Union representative would call upon Fall River "for the purpose of negotiating a collective bargaining agreement." At the time of this demand Fall River had 21 employees on the payroll, 18 of whom were former Sterlingwale employees. Fall River's initial production goal was to have a one-shift operation of 55 to 60 employees, and then to expand fully to a two-shift operation totaling 106–109 employees by April 1983.

On October 21, 1982, in a letter written by its counsel, Fall River indicated that it did "not intend to comply with [the Union's] request; and further ... that there was no legal basis for same."

On *November 1, 1982,* the Union filed an unfair labor practice charge with the Board, claiming that Fall River had violated Sections 8(a)(1) and (5) of the Act. By mid-November, Fall River had hired employees in virtually all job classifications. They were engaged in start-up operations, cleaning and repairing machines for the first 4–6 weeks, and carrying out experimental production on old Sterlingwale inventory during the next 4–5 weeks.

After investigation, the Regional Director of the Board on *December 21, 1982* issued a complaint charging Fall River with violation of Sections 8(a)(1) and (5) of the Act because "[o]n or about October 21, 1982, and at all times thereafter, Respondent did refuse and continues to refuse to meet and bargain collectively, with the Union as the exclusive representative of all the employees in the unit." A hearing was set for May 2, 1983.

On *January 4, 1983,* Fall River answered the complaint, the substance of which was a denial that it was a successor employer to Sterlingwale or that it had violated Sections 8(a)(1) and (5) of the Act.

In mid-January, 1983, the first shift was in full operation and a second shift was begun, with a total complement of 55 employees, approximately 36 of whom were former Sterlingwale employees. Furthermore, Fall River's Vice-President and Secretary, Herbert Chance, had formerly served as Vice-President of Sterlingwale until February, 1982. Over half of the dollar volume of Fall River's commission dyeing and finishing work came from customers who had also done business with Sterlingwale.

Fall River continued to expand until it reached its goal of a full complement of employees in *mid-April 1983*, with two 10-hour shifts employing approximately 106 to 109 persons. By March 24, 1983, former Sterlingwale employees were a minority of the employees in the production and maintenance unit.

The hearing before the administrative law judge began on May 2nd. The judge held in substance that the Union's October 19th demand was a continuing one that Fall River was bound to comply with at such time as its operations reached a "representative complement, not full complement." He then ruled "that the duty to bargain with the Union attached for [Fall River] in mid-January 1983," and ordered Fall River, *upon request of the Union*, to bargain.

A majority of the Board, with one dissenting vote, adopted the decision *in toto*, enforcement of which is now before us.

There are three distinct but related reasons why enforcement should be denied.

## I

The Board's "representative complement" rule contravenes the "full complement" rule enunciated by the Supreme Court in *N.L.R.B. v. Burns International Detective Agency, supra. See Criteria*, 11 Wake Forest L.Rev. at 449, 457. In *Burns* the Court was faced with a changeover of employers in an ongoing operation. Wackenhut Corporation, the initial employer, had a contract to provide security services to the Lockheed Aircraft Company. A majority of Wackenhut's employees voted in a Board-supervised election to be represented by a union and, thereafter, Wackenhut and the union negotiated a collective bargaining agreement. Approximately four months later Wackenhut's contract with Lockheed expired without renovation. Instead, Lockheed contracted with the Burns Detective Agency for these services. At the time of Burns' takeover, Burns employed 27 of Wackenhut's guards directly from the certified unit, in addition to which it completed the unit by bringing in 15 of its own guards from other Burns' locations. No hiatus occurred in the provision of services to Lockheed between the Wackenhut and Burns' operations. After the takeover Burns refused the union's request for recognition and compliance with the labor contract and the Board thereafter found Burns in violation of Sections 8(a)(1) and (5) of the Act as a successor of Wackenhut.

In sustaining the Board's findings regarding successorship, the Court stated:

In an election held but a few months before, the union had been designated bargaining agent for the employees in the unit and a majority of these employees had been hired by Burns for work in the identical unit. It is undisputed that Burns knew all the relevant facts in this regard and was aware of the certification and of the existence of a collective-bargaining contract. In these circumstances, it was not unreasonable for the Board to conclude that the union certified to represent all employees in the unit still represented a majority of the employees and that Burns could not reasonably have entertained a good-faith doubt about that fact, Burns' obligation to bargain with the union over terms and conditions of employment stemmed from its hiring of Wackenhut's employees and from the recent election and Board certification. It has been consistently held that a mere change of employers or of ownership in the employing industry is not such an "unusual circumstance" as to affect the force of the Board's certification within the normal operative period if a majority of employees after the

change of ownership or management were employed by the preceding employer.

406 U.S. at 278–79, 92 S.Ct. at 1577.

The Court then considered the Board's findings that Burns had violated the Act by unilaterally changing working conditions of the employer. The Court, in ruling against the Board stated:

> Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. *In other situations, however, it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by § 9(a) of the Act,* 29 U.S.C. § 159(a). Here, for example, Burns' obligation to bargain with the union did not mature until it had selected its force of guards late in June. The Board quite properly found that Burns refused to bargain on July 12 when it rejected the overtures of the union.

406 U.S. at 294–95, 92 S.Ct. at 1585–86 (emphasis supplied).

The present case is precisely one of the "other situations" referred to by the court in *Burns,* particularly when we consider the substantial differences between Burns and Fall River that militate in favor of Fall River: the lack of any expression of union preference by the employees for many years (Fall River) versus a recent election and certification (Burns), the non-existence of a labor contract (Fall River) in contrast

to one in effect (Burns), the start up of a new business entity after a substantial hiatus following the liquidation of the original employer (Fall River) versus a continuity of operations (Burns).

The court's reference to Section 9(a) of the Act in its ruling is of special relevance as it is this part of the Act that provides for selection of the employee's representatives "for the purpose of collective bargaining by the majority of the employees." [1] This provision establishes a strong public policy favoring free choice of a bargaining agent *by the employees* which should not lightly be frustrated. *Schmerler Ford, Inc. v. N.L.R.B.,* 424 F.2d 1335, 1339 (7th Cir.1970). It is because of this self-evident principle that four justices dissented in *Burns* against *any* application of the successorship principle to even the strong factual situation in *Burns,* concluding "that the Board and the Court of Appeals stretched that concept beyond the limits of its proper application". 406 U.S. at 296, 92 S.Ct. at 1586. As the dissent indicates, "the successorship doctrine, carried to its ultimate limits, runs counter to other equally well-established principles of labor law. Industrial peace is an important goal of the Labor Management Relations Act." *Id.* at 302, 92 S.Ct. at 1589. "But Congress has plainly been unwilling to purchase industrial peace at the price of substantial curtailment of free collective bargaining by the freely chosen representatives of the employees with their employer." *Id.* at 303, 92 S.Ct. at 1590.

The dissent, in concluding that the application of the successorship doctrine was not authorized by the Act, stated:

> The rigid imposition of a prior-existing labor relations environment on a new employer whose only connection with the old employer is the hiring of some of the latter's employees and the performance of some of the work which was previously performed by the latter, might well tend to produce industrial peace of a

---

**1.** 29 U.S.C. 159(a):

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive

representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: ...

sort. But industrial peace in such a case would be produced at a sacrifice of the determination by the Board of the appropriateness of bargaining agents and of *the wishes of the majority of the employees which the Act was designed to preserve.* These latter principles caution us against extending successorship, under the banner of industrial peace, step by step to a point where the only connection between the two employing entities is a naked transfer of employees.

*Id.,* at 306–07, 92 S.Ct. at 1591–92 (emphasis supplied). *See also Bargaining Obligations,* 88 Harv.L.Rev. at 763; *Criteria,* 11 Wake Forest L.Rev. at 457.

Although normally a dissent may be considered weak support upon which to base an opinion, the dissent in *Burns* buttresses the soundness of the majority's "full complement" requirement and its reliance on Section 9(a) of the Act for that proposition. Although the majority in *Burns* was not willing to set aside the successorship finding, it did so because it concluded that Burns' employees, *already operating at full complement, and shortly after having freely expressed their collective bargaining preference,* were not being denied their rights under the Act. By requiring a full complement of employees, *all employees* to be affected by the Board's actions were given a choice. The Board's contention that the "full complement" requirement in *Burns* constitutes mere dicta which it is cavalierly free to disregard, is hardly an approach that this court should be eager to follow. *See Pacific Hide & Fur Depot, Inc. v. N.L.R.B.,* 553 F.2d 609 (9th Cir.1977); *N.L.R.B. v. Pre-Engineered Building Products,* 603 F.2d 134 (10th Cir. 1979).

In the present case the Board's bureaucratic legalese deprives the *employees* of their right to express a free choice, a result totally contrary to the most fundamental purposes of the Act. It is, therefore, not entitled to enforcement. *Beth Israel Hospital, supra.*

## II

In the seminal case of *Universal Camera v. N.L.R.B., supra,* the Court laid down the rule for review of Board actions by courts of appeal:

> Congress has ... made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view.

340 U.S. at 488, 71 S.Ct. at 464. "The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Id.* The cumulative impact of multiplication of minutiae cannot be regarded as substantial evidence to support a finding by the Board. *N.L.R.B. v. United Parcel Service, Inc.,* 317 F.2d 912, 914 (1st Cir.1963). "Substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Coppus Engineering Corp. v. N.L.R.B.,* 240 F.2d 564, 570 (1st Cir.1957); *N.L.R.B. v. Local 776, IATSE (Film Editors),* 303 F.2d 513, 517 n. 3 (9th Cir.1962), *cert. denied,* 371 U.S. 826, 83 S.Ct. 47, 9 L.Ed.2d 65 (1962). Such evidence, however, is not substantial if it appears in isolation rather than is viewed in proper perspective. *Id.* Substantiality of evidence is measured by consideration of all the evidence and not merely that which supports the Board's conclusions. *M.R. & R. Trucking Co. v. N.L.R.B.,* 434 F.2d 689 (5th Cir.1970).

Accepting, as we must, this framework for review, I do not hesitate to find that the Board's conclusion that Fall River is a "successor employer" is not supported by substantial evidence. *See Note, The Successor Employer's Obligation to Bargain: Current Problems In The Presumption of a Union's Majority Status,* 8 Fordham Urb.L.J. 429, 442–44 (1980) (hereinafter cited as *Current Problems*).

The traditional test for determining successorship is whether there is *substantial continuity* between the employing enterprises. *Burns,* 406 U.S. at 279–81, 92

S.Ct. at 1577–79. In making this determination we look to whether there has been a change in the essential nature of the enterprises. *Burns, id.; Band-Age, Inc., supra,* 534 F.2d at 3; *N.L.R.B. v. Middleboro Fire Apparatus,* 590 F.2d 4, 6 (1st Cir. 1978). This question, as we have previously indicated, is highly fact specific. *Howard Johnson, supra.*

There is no question in my mind but that there has been *no continuity* between the operations of Sterlingwale and Fall River. It is undisputed that Sterlingwale ceased operations and went out of business for economic reasons. It is also undisputed that Fall River is a separate legal entity to Sterlingwale, with different ownership, financing, etc., *e.g.* the Board does not make any claim that Fall River is an *alter ego* of Sterlingwale. Fall River leases one of Sterlingwale's three buildings from a company, totally unrelated to Sterlingwale, who purchased it on the open market. Although Fall River uses machinery and equipment which at one time belonged to Sterlingwale, they also were purchased on the open market. Thus the fact that the building and machinery were once Sterlingwale's property should be totally irrelevant to the successorship determination. Fall River acquired no trade name, good will or other assets from Sterlingwale. It assumed none of Sterlingwale's liabilities. There was no transfer of employee or personnel records between Sterlingwale and Fall River and more importantly, no transfer of any employees or personnel. Those persons hired by Fall River who were former employees, supervisors, or executives of Sterlingwale were also hired from the open market after advertisement. Such new employment took place after *at least* a seven-month period had passed since their termination by Sterlingwale. The nature of Fall River's business is different from that of Sterlingwale's, commission work versus processing, thus bring about substantial changes in Fall River's operation when compared to Sterlingwale: a smaller manufacturing plant, less employees, less work shifts, longer working hours.[2] There was no transfer of customer lists or customers between Sterlingwale and Fall River, thus any former Sterlingwale customers who also became Fall River customers were presumably acquired in the open market. Last but not least, if the proper *Burns* standard is used, when Fall River reached full capacity, a majority of its employees were "new" employees. *See Current Problems,* 8 Fordham Urb.L.J. at 447.

This record, rather than substantially supporting the Board's conclusion of successorship, should mandate a ruling against it. The situation was stated in more appropriate language by Chief Judge Campbell in his dissent in *Band-Age:*

> The premise of the National Labor Relations Act is industrial democracy, requiring an employer to bargain with the representative of a majority of its employees. This democratic principle must, of course, yield to practicality and the need for industrial peace, as rules limiting the frequency of elections illustrate. But such rules, presuming the continuity of majority sentiment, evolved within the frame of a single enterprise. While they may be appropriately extended to genuine successor entities, they should not apply where the original bargaining unit and nature of the enterprise have been radically altered. I fear that the enlargement of the successorship doctrine to accommodate such a case may sweep aside the requirement that the Union have roots in the actual wishes of the employees. Here it would be simple to require an expression of the wishes of the 37 current employees rather than to presume, somewhat woodenly, that the earlier-expressed wishes of a different group of employees working for a different employer remain effective.

534 F.2d at 7 (citations omitted).

### III

This Court in *Middleboro Fire Apparatus,* a case involving the successorship doctrine held:

> have been relevant to demonstrate continuity.

---

**2.** There are no findings regarding similarity of wages and fringe benefits, factors which would

Simply stated, if the Board finds on the totality of the circumstances that a change in ownership did not affect the "essential nature" of the former business, then the new enterprise must recognize and bargain with the union that represented the employees of the former business. *The exception to this rule relevant here permits the new employer not to bargain with the union if the employer could "reasonably have entertained a good-faith doubt" about the union's continued majority status.* 590 F.2d at 6. (Emphasis supplied. Citations and footnotes omitted).

The facts of this case as evidenced by both the Board majority and dissent leave no question as to Fall River's good faith doubt[3] in denying union recognition. *See Current Problems*, 8 Fordham Urb.L.J. at 431, 448.

On October 19, 1982, when recognition and bargaining was requested, the Board concluded that the union was not legally entitled to compliance with this request. As a matter of law, Fall River would have violated Section 8(a)(2) of the Act if it had acceded. 29 U.S.C. 158(a)(2), *see Hedstrom Co. v. N.L.R.B.*, 558 F.2d 1137, 1146–48 (3d Cir.1977), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). The Board also conceded that Fall River was correct on October 21, when it formally denied the Union's request. If we continue this line of reasoning, when the Union filed its charge on November 1, even if Fall River had accepted these allegations, the Board would also have been legally bound to rule, as it did in its decision, that the Union did not at that point represent Fall River's employees. This hypothesis is equally applicable to December 21, when the Regional Director issued a complaint, and even as late as January 4, 1983 when Fall River answered the same. By what logic or reasoning can events that took place thereafter retroactively be made to transform these good faith rejections by Fall River into illegal conduct? At best the Board's ambiguous criteria create an unacceptable uncertainty in the standard of conduct required of "successors." *See Current Problems*, 8 Fordham Urb.L.J. at 447–449; *Bargaining Obligations*, 88 Harv.L. Rev. at 760, 764; *Criteria*, 11 Wake Forest L.Rev. at 446, 457. This court should not place upon it the imprimatur of legality by enforcing the Board's order.

The issue presented is in reality two-pronged: (1) do these circumstances objectively justify a good faith doubt by Fall River in mid-January, 1983, and (2) is it permissible (*e.g.*, rational) to allow the Board to presume continued Union majority support under the facts of this case in view of the requirements of Section 9 of the Act?

I believe the proper answer to both questions to be in the negative.

If the Board found Fall River to be free from any illegal conduct when the demand was made on October 19, when rejected on October 21, when the complaint issued on December 21st, and when it was answered on January 4, it cannot follow that by the mere "running [of] one shift at full capacity" in mid-January 1983, this fact triggered a duty to bargain with the Union. An objective view of this situation, particularly considering the dynamic circumstances under which they developed, cannot justify the hanging of a bad faith label on Fall River. The factual basis for the presumption of continued majority support for the Union is lacking.

Stated differently, given the facts of this case, there is no rational basis for having an illegal demand (*e.g.*, one which if complied with by Fall River would have subjected it to violation of Section 8(a)(2) of the Act) carryover *ad infinitum*, thus permitting the imposition of a union on employees who have not expressed a free choice since 1968. Such a rule is clearly contrary to the purposes of the Act as stated in Section 9.

---

**3.** "In its simplest form, the phrase implies breach of faith, wilful failure to respond to plain, well-understood statutory or contractual obligations." *N.L.R.B. v. Knoxville Pub. Co.*, 124 F.2d 875, 883 (6th Cir.1942); *Hurry v. Jones*, 560 F.Supp. 500, 507 (D.R.I.1983).

It is ironic, to say the least, that the Board order enforced today requires Fall River to bargain with the Union *upon request.* Yet this minimal effort is dispensed with in deciding the merits of this case.

This Court should not be eager to embrace doctrines fraught with perceptions that run contrary to the spirit and letter of the Act, and which radically depart from logic and common sense.

For the above-stated reasons, I dissent.