**SULLIVAN INDUSTRIES, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**United Steelworkers of America, AFL–CIO, Intervenor.**

**No. 91–1169.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 6, 1992.

Decided March 13, 1992.

Donald W. Selzer, Jr., with whom Andrea J. Nordaune, St. Paul, Minn., was on the brief, for petitioner.

Christopher W. Young, Attorney, N.L.R.B., with whom Jerry M. Hunter, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Linda D. Dreeben, Supervisory Attorney, N.L.R.B., Washington, D.C., were on the brief, for respondent.

Rudolph L. Milasich, Jr. and David Goldman, Pittsburgh, Pa., were on the brief, for intervenor.

Before WALD, RUTH B. GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Opinion concurring in part and dissenting in part filed by Circuit Judge SILBERMAN.

WALD, Circuit Judge:

Petitioner Sullivan Industries, Inc. ("New Sullivan") seeks review of an order of the National Labor Relations Board ("Board" or "NLRB") to recognize and to bargain with intervenor United Steelworkers of America ("Union"). The Board affirmed and adopted a decision of the Administrative Law Judge ("ALJ") that New Sullivan violated subsections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5) (1988) (the "Act"), by refusing to recognize and bargain with the Union in August 1988 when its obligations to do so arose under the Act. The Board also found that although New Sullivan did briefly recognize the Union for a day or two in October 1988, the subsequent withdrawal of recognition violated subsections

8(a)(1) and (5) of the Act, because the petition on which New Sullivan purportedly relied for its conclusion that the Union no longer enjoyed majority support had been tainted by the unfair labor practice of delaying recognition in the first place. The Board has cross-applied for enforcement of its order.

We conclude that substantial evidence supports the Board's conclusion that New Sullivan engaged in an unfair labor practice by not recognizing the Union in August 1988, and we shall enforce the Board's order insofar as it requires New Sullivan to cease and desist from failing to recognize the Union. However, we remand the case to the Board for an explanation of its decision that the employee petition disavowing the Union signed in October 1988 was tainted and for a reasoned consideration of the competing interests relevant to the issuance of a bargaining order under the circumstances presented here.

## I. BACKGROUND

### A. *Facts*

For the past forty years, the Union has represented the production and maintenance employees (excluding office and clerical workers) at a compressor-manufacturing facility located in Claremont, New Hampshire. For most of these years, the facility was owned and operated by Joy Manufacturing Company ("Joy"), which manufactured air compressors and rock drills used primarily to build highways and pipelines. The compressor-manufacturing industry is seasonal; sales are greatest in the Winter and Spring and slower in the Summer and Fall.

In 1984, Joy sold the Claremont facility to Sullivan Machine Company ("Old Sullivan"). Old Sullivan continued in the same business as Joy, and the unit employees [1] employed by Old Sullivan continued to be represented by the Union. Several collec-

tive-bargaining agreements were negotiated, the latest of which was executed on May 4, 1987, effective until September 29, 1990 ("1987 Agreement").

Old Sullivan filed for bankruptcy under Chapter 11 and, in March 1988, it closed the Claremont facility. One month later, the bankruptcy court appointed Asset Acquisition and Management Corporation ("AAMC") to manage the business in the interim, and the plant was reopened on a limited basis. During this period, AAMC continued to recognize the Union and adhere to the 1987 Agreement. In June 1988, the personnel manager for Old Sullivan advised the Union that Old Sullivan would close down its business as of June 30 and that all employees of the company would be terminated. He also advised all employees that New Sullivan, which had been formed by principals of AAMC and incorporated for the express purpose of acquiring the Claremont facility, would be accepting applications for employment for all shop and office positions. *See* Letter of Norman L. Brunelle to All Employees of Sullivan Machinery Company (June 10, 1988); *see also* Letter from Norman L. Brunelle to United Steelworkers of America (June 10, 1988).

On July 6, 1988, the Claremont facility was reopened under new ownership with approximately 45 production and maintenance employees, of which a majority were former Old Sullivan employees performing essentially the same work as before. The only significant change was that New Sullivan instituted a simplified job classification system as compared to that used by Old Sullivan.

David A. Pollock managed the facility first with AAMC and then as President and Chief Operating Officer of New Sullivan. On July 6, 1988, Pollock met with representatives of the Union who requested recognition and adherence to the 1987 Agree-

---

**1.** The bargaining unit has been defined as follows:

[A]ny employee of the Company at its operations at Claremont, New Hampshire, excluding executives, supervisors, assistant supervisors, guards, office and clerical workers.

Agreement Between Sullivan Machinery Company and United Steelworkers of America Local 2944, art. 1, para. 1.02 (May 4, 1987).

ment. Pollock told the representatives that New Sullivan would decide on recognition only after it had hired a "substantial and representative complement" of employees and that New Sullivan was not a party to the 1987 Agreement and was not bound by its substantive provisions.

Shortly after the meeting with the Union representatives, Pollock informed a group of unit employees that it would be premature to recognize the Union and that the company was not obligated to honor the 1987 Agreement. Later that week, he met with a group consisting of both unit and non-unit employees and informed them of the company's position with respect to Union recognition.

In early August, Pollock met again with approximately 90 to 100 employees. Pollock informed them of the production and sales figures for the previous month and of the projections for the upcoming month. Pollock also told them that the company anticipated reaching a "substantial and representative complement" of employees in late September or early October and that it would make a decision about recognition at that time. Pollock said that

he would recognize the union, [that] he has no problem with it, and that if the people didn't want the union they'd have to come forward and tell him, and that he had an open door policy that people could go in and talk to him any time they wanted.

Transcript of Testimony Before the ALJ ("Tr.") at 57 (testimony of unit employee Leon Morin). Pollock also recalled that, after this August meeting, an employee asked him what the employees should do if they did not want the Union. Pollock responded that he could not discuss that issue. *See id.* at 141 (testimony of Pollock).

On August 9, 1988, the Union filed an unfair labor practice charge against New Sullivan, claiming that the company had discriminated against certain Union employees by refusing to hire them and that it had unlawfully refused to recognize the Union. The charge was amended by dropping the claim of unlawful discrimination

on September 30, 1988, leaving only the refusal to bargain charge.

Pollock met again with all employees (about 120, of which 90 were unit employees, were present) on September 1, 1988. After reviewing sales and production figures as well as projections for the coming month, Pollock once again informed the employees that the company would likely have a "substantial and representative complement" of its work force by early October and that it would also be "approaching normal production" so that a decision about union recognition could be made at that time.

By letter dated October 4, 1988, New Sullivan indicated that it would recognize the Union. *See* Letter from Attorney Donald W. Selzer, Jr. to Attorney Larry Engelstein (Oct. 4, 1988). On the next day, Pollock called a meeting of the unit employees. He informed them that New Sullivan was now prepared to recognize the Union. He also indicated that unfair labor practice charges had been filed against the company because it had not recognized the Union earlier. Later that day, Pollock received a petition signed by 60 of the 90 unit employees indicating that they did not "wish to be represented by the United Steelworkers Union or any union at this time."

On the following day—October 6, 1988— New Sullivan informed the Union that it would withdraw its recognition of the Union in light of the petition. *See* Letter from Attorney Donald W. Selzer, Jr. to Attorney Larry Engelstein (Oct. 6, 1988). On October 18, 1988, the Union filed a second unfair labor practice charge against New Sullivan, claiming that the company had unlawfully solicited unit employees to sign a petition disclaiming interest in union representation. This charge was amended on November 22, 1988 to claim only that New Sullivan had unlawfully withdrawn recognition of the Union.

## B. *Procedural History*

The two unfair labor practice charges— essentially that New Sullivan unlawfully refused to recognize and bargain with the Union between August 10 and October 4,

1988 and that it unlawfully withdrew recognition on October 6, 1988—were consolidated by the NLRB Regional Director, and a consolidated amended complaint was filed on December 6, 1988. The case was tried before ALJ Irwin Kaplan on February 13 and 14, 1989, and he issued his decision and recommended order on September 8, 1989. *See Sullivan Industries, Inc.*, 1–CA–25698, –25869 (Sept. 8, 1989) (*"ALJ Decision"*).

ALJ Kaplan concluded that New Sullivan violated subsections 8(a)(1) and (5) of the Act by withholding recognition and refusing to bargain with the Union until October. He concluded further that New Sullivan's delay in recognition tainted the employee petition such that New Sullivan was not entitled to rely on that petition as evidence that the Union no longer enjoyed majority support. Its subsequent withdrawal of recognition thus violated subsections 8(a)(1) and (5) of the Act. The ALJ recommended that the Board order New Sullivan to cease and desist from refusing to recognize the Union and that it order New Sullivan to bargain with the Union.

New Sullivan filed exceptions to the ALJ's decision. On March 21, 1991, a three-judge panel of the Board affirmed the ALJ's ruling, findings, and conclusions and adopted his recommended order. *Sullivan Industries, Inc.*, 302 N.L.R.B. (No. 23) (Mar. 21, 1991) (*"Board Decision and Order"*). New Sullivan petitioned this court to set aside the Board's final order pursuant to section 10(f) of the Act, 29 U.S.C. § 160(f) (1988), and the Board applied for enforcement of its order pursuant to section 10(e) of the Act, *id.* § 160(e).

## II. Discussion

### A. *Standard of Review*

■ According to the Act, "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall ... be conclusive." *Id.* § 160(f). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement ... that courts

consider the whole record." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

Judicial review of the Board's determination of a remedy is particularly deferential for "the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969). However,

> this court is a reviewing court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act.

*Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C.Cir.1980).

### B. *The Refusal to Bargain*

■ It is undisputed in this case that New Sullivan is the successor corporation to Old Sullivan and that, at all times relevant to this dispute, a majority of the employees in the bargaining unit employed by New Sullivan were former employees in the bargaining unit of Old Sullivan. *See* Tr. at 15–16 (stipulations read into record). In *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Court recognized that a presumption of majority status exists where a new employer takes over a company in which the bargaining unit remains unchanged and a majority of the employees hired by the new employer are represented by a bargaining agent that had been recently certified. *Id.* at 281, 92 S.Ct. at 1579.

The theory behind the *Burns* presumption that a union enjoys majority status after a successor employer takes over is that it furthers industrial peace. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 40, 107 S.Ct. 2225, 2234, 96

L.Ed.2d 22 (1987). While a successor has a duty to bargain with an incumbent union, it is not bound by the substantive terms of the previously negotiated collective-bargaining agreement. *See Burns,* 406 U.S. at 284, 92 S.Ct. at 1580.

While *Burns* established that a successor employer has an obligation to recognize and bargain with the union representing the predecessor's employees so long as a majority of the successor's employees are unit employees of the predecessor, the question of *when* the successor employer has the obligation to recognize and bargain with the union remained an open question until the Court decided *Fall River Dyeing* in 1987. After going out of business in the late summer of 1982, the Fall River, Massachusetts textile dyeing and finishing plant reopened in September 1982 under new owners. The new company began hiring workers, and its initial goal was to attain one full shift comprising 55 to 60 employees; if the business succeeded, the company had plans to expand to two shifts. During the first six weeks, the company started operations and experimented with various products. By mid-January 1983, the company had hired its first shift of workers. Of the 55 employees, 36 had worked for the predecessor company. By mid-April 1983, the company expanded to two shifts, and for the first time, the former employees of the predecessor constituted a minority of the work force. The company argued that it was not a successor corporation because it had discontinued certain products of the predecessor and that, in any case, it had not achieved its full complement of employees until mid-April 1983, a point at which it no longer had to recognize the union because the union no longer could be presumed to represent a majority of employees.

The Board rejected the company's argument, and the court of appeals enforced the Board's order. The Board determined that the company was a successor corporation, because the differences in the businesses were not "sufficiently significant to require a finding that the continuity of the enterprise, viewed from the employees' standpoint, was broken." *Fall River Dyeing,* 482 U.S. at 35, 107 S.Ct. at 2231–32 (quoting the Court of Appeals, 775 F.2d 425, 430 (1st Cir.1985)). Second, the Board reasoned that the company had an obligation to recognize and bargain with the union in mid-January 1983, when it had filled its first shift of workers and had attained a representative complement of employees. The Supreme Court affirmed the court of appeals and approved the Board's application of the "substantial and representative complement" rule, according to which a successor has a duty to recognize and bargain with a union if, at the moment the employer has hired a substantial and representative complement of its total work force, a majority of the successor's unit employees had been employed by its predecessor. *Id.* at 52, 107 S.Ct. at 2240.

■ The "substantial and representative complement" rule is intended to strike a balance between the objectives of insuring maximum employee participation in the selection of the bargaining representative and of permitting employees to be represented as quickly as possible after an employer succession. *See id.* at 48–49 & n. 15, 107 S.Ct. at 2238 & n. 15. Waiting until all employees have been hired and all positions have been filled—i.e., until the work force is at "full complement"—before determining a union's majority status would guarantee to all employees a voice in the selection of the bargaining agent but would sacrifice the employees' interest in being represented as quickly as possible. On the other hand, recognizing a union prematurely risks violating section 8(a)(2)'s prohibition against interference with the formation of a labor organization, *see* 29 U.S.C. § 158(a)(2) (1988).[2]

The Court identified five factors that an employer should consider in deciding when

---

2. Significantly, however, a good-faith violation of section 8(a)(2) subjects an employer only to a remedial order. *Fall River Dyeing,* 482 U.S. at 51 n. 18, 107 S.Ct. at 2240 n. 18; *International*

*Ladies Garment Workers' Union v. NLRB,* 366 U.S. 731, 740, 81 S.Ct. 1603, 1608, 6 L.Ed.2d 762 (1961).

a "substantial and representative complement" exists: (1) the degree to which job classifications designated for the operation have been substantially filled; (2) the extent to which the operation is in substantially normal production; (3) the actual size of the complement; (4) the time expected to elapse before a substantially larger complement would be hired; and (5) the relative certainty of the employer's expected expansion. · *Fall River Dyeing,* 482 U.S. at 49, 107 S.Ct. at 2239 (citing *Premium Foods, Inc. v. NLRB,* 709 F.2d 623, 628 (9th Cir. 1983)).

The Court recognized in *Fall River Dyeing* that it might not always be simple for the employer to determine the precise moment when a "substantial and representative complement" was in place. In the case of an initial election—the context in which the rule was originally developed—it is the Board that applies the rule, not the employer. *See id.* at 48 n. 15, 107 S.Ct. at 2238 n. 15. The Court reasoned, however, that the employer is in the best position to apply the rule in the context of succession:

> The employer generally will know with tolerable certainty when all its job classifications have been filled or substantially filled, when it has hired a majority of the employees it intends to hire, and when it has begun normal production.... [G]iven the expansionist dreams of many new entrepreneurs, it might well be more difficult for a successor to identify the moment when the "full complement" has been attained....

*Id.* at 50–51, 107 S.Ct. at 2240.

In this case, the Board considered projected and actual sales and hiring figures in order to determine when New Sullivan had begun substantially normal production and when it had hired a majority of its intended work force. A comparison of the actual and projected sales of New Sullivan's major portable compressor—the D185—is revealing. New Sullivan argues that October 1988 was the first month in which "anywhere near normal production of the D185" was achieved because it sold slightly less than half the number it projected for April 1989 (58 as opposed to

120). Brief for Appellant (filed Oct. 8, 1991) ("Appellant's Brief") at 18. But New Sullivan's projections are suspect. While more D185s were produced in October 1988 than were produced in August 1988 (58 compared with 20), *fewer* were produced in December 1988 (17) than in any previous month under New Sullivan's management. This significant reduction was not anticipated in New Sullivan's projections because, according to Pollock, "he had not anticipated taking inventory in December nor had he taken into account the holidays at the end of that month." *ALJ Decision* at 10. Pollock apparently gave no explanation for the reduction in sales between October and November (from 58 to 25), in spite of New Sullivan's projections that the production would increase over that same period (from 50 to 60). *See id.* at 10 n. 11.

A comparison between projected and actual employment of the work force is also illuminating. First, the fact that New Sullivan's sales projections were found to be unreliable suggests that the same may be true of its workforce projections; the number of employees that the company would expect to hire depends on the company's projections of the amount of work anticipated.

But even assuming that New Sullivan's work-force projections are reasonable, they do not prove its point that it did not have a substantial and representative complement until October 1988, when its 93 employees represented roughly half of its projected full complement of 180 for April 1989. April was the peak month, and at other points in the year, the full work force would be reduced to 150–160. We believe the Board reasonably concluded that "the 79 unit employees employed during the pay period ending August 12, 1989 [sic], constituted a substantial and representative complement" of the year-round work force. *Board Decision and Order* at 2 n. 2.

New Sullivan argues further that the simplified job classification system that it employed made it appear that all job classifications designated for the operation had been substantially filled by August 1988, whereas in reality, "job functions within

those classifications were not yet stabilized." Appellant's Brief at 25. In other words, New Sullivan argues that the simple filling of job *classifications* was not an accurate indication of whether job *functions* were being performed. *Id.* at 26. But the ALJ found that by August 1988, "the production line was substantially off the ground with all departments in operation." *ALJ Decision* at 10. The fact that the employees hired first were more versatile and capable of performing several different job functions, *see* Tr. at 195 (testimony of Pollock), does not alter the fact that by August 1988, New Sullivan was capable of producing the compressors that represented 80% of its business. Even if all of the job functions were not filled by August 1988, the jobs performed were sufficiently representative of normal conditions to justify imposing the bargaining obligation at that time.

Finally, New Sullivan faults the Board for having failed even to consider two of the five factors discussed in *Fall River Dyeing*. It is true that the Board paid little attention to two of the factors—the time expected to elapse before a substantially larger complement would be at work and the relative certainty of the employer's expected expansion—but there is nothing in *Fall River Dyeing* to suggest that the five factors are mandatory or that they all count equally. Furthermore, there was little for the Board to consider with respect to these two factors. The Board agreed with the ALJ's finding that New Sullivan's "projections of employment levels were unreliable," *Board Decision and Order* at 2 n. 2. Both the timing and likelihood of the projected expansion were supported solely by the projections and testimony of Pollock, a witness found not to be credible by the ALJ:

> Pollock testified that he projected from 150 to 160 unit employees as the normal employee complement for the year 1989. However, as Pollock was unsure of these projections and as I found him otherwise to be an unreliable witness, I regard them as little more than self-serving predictions and hardly probative.

*ALJ Decision* at 11 n. 13. In light of these credibility findings, the timing and probability of further expansion could not reliably be ascertained.

The Board's determination that there existed a substantial and representative complement of employees on August 10, 1988 is supported by substantial evidence in the record. It is undisputed that on August 10, 1988, a majority of New Sullivan's employees had been unit employees of the predecessor company. Therefore, New Sullivan had a duty to recognize and bargain with the Union on August 10, 1988, and its refusal to do so constituted an unfair labor practice in violation of 29 U.S.C. § 158(a)(1) and (5).

## C. *The Withdrawal of Recognition*

██ The general rule is that once a union has been certified by the Board as a collective bargaining agent, it enjoys a presumption of continued majority status which is irrebuttable for the first year and rebuttable thereafter. *See, e.g., St. Agnes Medical Ctr. v. NLRB*, 871 F.2d 137, 145 (D.C.Cir.1989); *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1300 (D.C.Cir. 1988). After the initial year, an employer may rebut the presumption and withdraw recognition if the employer has a reasoned basis in fact to doubt the union's continuing majority status. *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 38 (D.C.Cir. 1980); *see also NLRB v. Nu–Southern Dyeing & Finishing, Inc.*, 444 F.2d 11, 15 (4th Cir.1971). The reasonable doubt must be asserted in good faith and may not be raised in order to cause disaffection with the union. *Peoples Gas*, 629 F.2d at 38; *Nu–Southern Dyeing*, 444 F.2d at 15.

██ It is well settled that reasonable doubt of a union's majority status will be found if the asserted doubt is based on objective considerations and such doubt is raised in a context free of unfair labor practices "of such a character as to either affect the Union's status, cause employee disaffection, or improperly affect the bargaining relationship itself." *Guerdon Indus., Inc.*, 218 N.L.R.B. 658, 661 (1975); *see also Hotel, Motel & Restaurant Employ-*

ees Local 19 v. NLRB, 785 F.2d 796, 799 (9th Cir.1986); Nu–Southern Dyeing, 444 F.2d at 16. A petition signed by a majority of employees in which they indicate that they do not wish to be represented by the union ordinarily constitutes sufficient objective evidence to rebut the union's presumed majority status. See NLRB v. Blevins Popcorn Co., 659 F.2d 1173, 1183 n. 56 (D.C.Cir.1981); NLRB v. Sacramento Clinical Lab., Inc., 623 F.2d 110, 114 (9th Cir.1980). If, however, the General Counsel of the Board comes forward with evidence to show that the union's decline in support was attributable to the employer's misconduct, the employer's good-faith defense to the withdrawal of recognition will fail. Hotel, Motel & Restaurant Employees, 785 F.2d at 799.

The Board concluded in this case that New Sullivan's refusal to bargain on August 10, 1988 not only constituted an unfair labor practice but also "improperly undermined the union's majority status thereby tainting the employee petition." ALJ Decision at 12. The Union relies on a passage from Fall River Dyeing to support the Board's conclusion:

> "[O]nce it has been determined that an employer has unlawfully withheld recognition of an employees' bargaining representative, the employer cannot defend against a remedial bargaining by pointing to an intervening loss of employee support for the union when such loss of support is a foreseeable consequence of the employer's unfair labor practice."

Fall River Dyeing, 482 U.S. at 51 n. 18, 107 S.Ct. at 2240 n. 18 (quoting the Court of Appeals, 775 F.2d at 433). Although this passage could suggest that an unlawful failure to recognize will taint any subsequent showing of loss of employee support for the union, in the very next sentence, the Court stated: "That petitioner's refusal to bargain with the Union undermined the employees' support for the Union and thus led to the petitions is suggested by evidence in the record." Id. (emphasis added). In fact, there was testimony at the hearing that certain employees feared that unless they signed the petition, a wage increase would be further delayed. The

evidence in Fall River Dyeing thus supported the conclusion that the refusal to recognize in fact caused the employee disaffection on which the company purported to rely.

In contrast, the record in this case contains no evidence affirmatively showing that the delay in recognizing the union led to the employee petition. The Union had alleged that Pollock made certain coercive statements to the employees, but the ALJ dismissed these allegations in their entirety. Although he found Pollock not credible in his testimony concerning New Sullivan's sales and work-force projections, he nonetheless concluded "that the record falls short of establishing that the remarks made by Pollock at the meeting in question in August are coercive or are otherwise violative of Section 8(a)(1), noting particularly an absence of any unlawful threats or promise of benefits." ALJ Decision at 15.

Furthermore, the company in Fall River Dyeing never recognized the Union, and it never suggested that it would even consider recognizing the Union. In contrast, Pollock regularly met with all employees and informed them that he anticipated resolving the recognition issue in early October. New Sullivan eventually did recognize the Union—albeit briefly—in early October. In Fall River Dyeing, seven months had elapsed between the unfair labor practice and the petition, while in this case, the time between the point at which the employer should have recognized the Union and the time it did was only two months.

Apart from the distinguishing factors in Fall River Dyeing, the ALJ and Board's conclusory statements in this case that any unlawful delay in recognition automatically taints a subsequent employee petition disclaiming the union runs counter to the Board's explicit and consistent rejection in other cases of any such general per se rule. In Celanese Corp., 95 N.L.R.B. 664 (1951), the Board established the following principle on which it has repeatedly relied: "By its very nature, the issue of whether an employer has questioned a union's majority in good faith cannot be resolved by resort to any simple formula. It can only be

answered in the light of the totality of all the circumstances involved in a particular case." *Id.* at 673.

In *Guerdon Industries,* the Board directly considered the effect of certain unfair labor practices on the legitimacy of an employee petition. The Board concluded that the petition had been tainted because the company had unilaterally announced an incentive wage plan without notifying the union and because a company representative had informed the employees that a union-secured wage increase would "kill" the incentive plan. Under these compelling circumstances, the Board found the decertification petition to be tainted. But it cautioned against any "overreading" of its decision:

> In so agreeing with the Administrative Law Judge, however, we stress that it is not simply because Respondent, in fact, committed unfair labor practices that we have found its withdrawal illegal, but rather it is because of the serious nature of these violations that we have concluded as we have. Thus we are not applying our principles concerning this withdrawal of recognition in a *per se* manner but, consistent with our promise in *Celanese,* we have viewed "the totality of all the circumstances" surrounding Respondent's withdrawal of recognition.

*Guerdon Indus., Inc.,* 218 N.L.R.B. 658, 661 (1975); *see also Airport Aviation Servs. Inc.,* 292 N.L.R.B. 823, 832 (1989) (failure to comply with certain union information requests violated subsections 8(a)(1) and (5) but did not taint petition; not "every unfair labor practice will override that which, in the total circumstances, seemingly appears as the clear, uncoerced choice of bargaining unit personnel"); *Purolator Prods., Inc.,* 289 N.L.R.B. 986, 993 (1988) (denial of representation to union member at investigatory interview and unilateral imposition of disciplinary procedures "were not sufficient to significantly contribute to the loss of majority" and thereby taint petition).

In all these cases, the Board considered whether a causal connection exists between unfair labor practices and the union's loss of majority support. Developed first in *Olson Bodies, Inc.,* 206 N.L.R.B. 779, 784–85 (1973), and later explicitly enumerated in *Master Slack Corp.,* 271 N.L.R.B. 78 (1984), the factors the Board uses for determining whether unlawful conduct has a meaningful impact on employee support for the union are the following: (1) the length of time between the unfair labor practices and the employee petition; (2) the nature of the unfair labor practices, including whether they are of a nature that would cause a detrimental or lasting effect on the employees; (3) the tendency of the unfair labor practices to cause employee disaffection with the union; and (4) the effect of the unlawful conduct on the employees' morale, organizational activities, and membership in the union. *See id.* at 84; *see also St. Agnes Medical Ctr. v. NLRB,* 871 F.2d 137, 146–47 (D.C.Cir.1989) (employer may not rely on employee petition as evidence of good-faith doubt in union's majority status if prior unfair labor practices " 'significantly contribute to such a loss of majority or to the factors upon which a doubt of such majority is based' " (quoting *Nu–Southern Dyeing,* 444 F.2d at 16)).

The Board has never explicitly carved out any exception to its totality of the circumstances/causal nexus test for either successor employers or for the unfair labor practice of refusal to bargain. We turn now to an examination of whether the Board has nonetheless followed a different tack where successor employers or refusal to bargain practices are involved, and, if so, of the consequences of that distinction for this case.

### 1. *Successorship*

The Supreme Court has indeed recognized that employees are particularly vulnerable after a successor employer takes over a company:

> If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union is subject to the vagaries of an enterprise's transformation.... [T]hey might be inclined to shun support for their former union,

especially if they believe that such support will jeopardize their jobs with the successor or if they are inclined to blame the union for their layoff and problems with it.

*Fall River Dyeing,* 482 U.S. at 39–40, 107 S.Ct. at 2234. "Without the presumptions of majority support and with the wide variety of corporate transformations possible, an employer could use a successor enterprise as a way of getting rid of a labor contract and of exploiting the employees' hesitant attitude towards the union to eliminate its continuing presence." *Id.* at 40, 107 S.Ct. at 2234.

On the one hand, our research has discovered no cases in which a successor company that was found to have committed an unfair labor practice was nonetheless permitted to rely on a subsequent decertification petition as grounds for its good-faith belief in the loss of majority support. But, on the other hand, we have found no acknowledgement in the Board's case law that successors are subject to a *per se* rule while a case-by-case "totality of the circumstances" approach is appropriate with respect to other employers also operating under a rebuttable presumption of a union's majority status. Such a distinction between successor and non-successor employers may be justifiable; but at this point, it has not yet been acknowledged, let alone justified. As we shall see, the Board has always relied on evidence other than the successorship alone to justify its conclusion that the petitions were tainted.

### 2. *A Refusal to Recognize*

■ A second possible basis for treating this case differently from the general case requiring a "nexus" between the unfair labor practice and the loss of union support is that it involves a particularly egregious kind of 8(a)(5) violation—a refusal to recognize an incumbent union. Here we find that although the Board has never explicitly articulated such a *per se* rule for taint, it has, on occasion, hinted that one might be appropriate.

In *Transportation Equipment Services, Inc. d/b/a Bay Area Mack,* 293 N.L.R.B. 125 (1989) ("*Bay Area Mack*"), a successor employer began operations on December 3, 1986 with a substantial and representative complement of employees, a majority of whom had been employed by the predecessor and represented by the union. On December 11, the union made a proper demand for recognition and good-faith bargaining. On January 22, 1987, a majority of the unit employees signed a petition declaring that they did not wish to be represented by the union. The employer pointed to the January petition as proof that the union did not have the requisite support in December. The ALJ necessarily concluded that the January 22 petition could not be used retroactively by the employer as grounds for its good-faith doubt in the union's majority status as of December 11. There was no other objective evidence presented to support a good-faith doubt at the time the employer's obligation to recognize the union arose.

Despite the fact that the ALJ concluded that the petition itself was largely irrelevant, he nonetheless suggested that it was, in any case, "tainted": "A successor-employer's refusal to honor a proper union recognitional demand will be deemed, in itself, an unlawful act which fatally taints a later antiunion petition from employees which might otherwise support a claim of good-faith doubt about the union's majority status." *Id.* at 131. The cases on which the ALJ relied for this statement, however, did not uniformly apply such a rule. Some of the cases, like *Bay Area Mack* itself, involved employers asserting that they had a good-faith doubt in the union's majority status at the time they refused to recognize the union, based only on antiunion petitions submitted *after* that date. *See, e.g., First Food Ventures, Inc.,* 229 N.L.R.B. 1228, 1230 (1977) ("the sum total of evidence of employee disaffection available to Respondent was discovered only *after* Respondent's initial refusal to bargain" (emphasis in original)). In this case, New Sullivan offered the petition not to justify its prior refusal to bargain (as in *First Food Ventures*) but rather to justify its withdrawal of recognition, which came after the petition.

Opinions in other cases on which the ALJ in *Bay Area Mack* relied, however, appeared implicitly to rely on a *per se* taint rule but offered no explanation or citation to justify it. In *Western Distributing Co. d/b/a Western–Davis Co.,* 236 N.L.R.B. 1224 (1978), *enforcement denied on other grounds,* 608 F.2d 397 (10th Cir.1979) (*"Western–Davis Co."*), the employer disputed the union's majority status on the grounds that the proper unit should include certain long-haul drivers, so that a majority of the unit would not consist of former employees of the predecessor company. The Board, on the other hand, concluded that the unit should appropriately be defined to exclude the long-haul drivers, so that a majority of the employees would be union members in the predecessor company. On that basis, the Board found that the successor had a duty to bargain and that its refusal to bargain constituted an unfair labor practice. Without any further explanation, the Board stated: "The employee petition purporting to disclaim any interest in union representation emerged after Western–Davis's unlawful refusal to recognize the Union, and therefore cannot be used to overcome the presumption of the Union's continued majority status." *Id.* at 1227.

In *Ponn Distributing, Inc.,* 232 N.L.R.B. 312 (1977), *enforcement denied on other grounds sub nom. NLRB v. Cott Corp.,* 578 F.2d 892 (1st Cir.1978), the former employer had been found to have committed certain unfair labor practices, and the Board had ordered it to bargain with the union. Shortly before the Board's order, Cott Corporation foreclosed on its security interest in the former employer's assets and assumed control of the distributorship. Cott disputed that it was a successor, and it denied that it had assumed the former employer's obligation to bargain with the union. Although it steadfastly maintained that it did not have any *legal* obligation to recognize the union, Cott nonetheless conducted a "few bargaining sessions" with union representatives until a decertification

petition was signed three months later. The Board concluded that Cott *was* a successor and that it had an obligation to remedy the unfair labor practice of its predecessor.[3] The Board further concluded that *"in these circumstances* Cott could not validly rely on the decertification petition as a reason to terminate bargaining." *Id.* at 315 (emphasis added).

In none of these cases did the Board ever present a coherent explanation for why it was not necessary to show a causal connection between the earlier refusal to bargain and the employee disaffection as expressed in the petitions. All of these cases, furthermore, involved employers that not only failed to recognize the union but maintained throughout the period that they would never bargain with the union. That is not the case here.

We have found only one case that relies on *Bay Area Mack* as precedent to find that an employee petition was tainted, and in that case, too, there were aggravating factors over and above the refusal to bargain. In *Manna Pro Partners,* 304 N.L.R.B. (No. 104) (Aug. 27, 1991), six days before the new employer was scheduled to reopen a feed mill, the union requested recognition. After interviewing the predecessor's former employees, the employer reopened the mill on February 26, 1990 with a majority of its new employees coming from the ranks of the predecessor's work force. The Board determined that, as of February 26, the employer had a legal obligation to recognize and bargain with the union unless it had "a sufficient objective basis to support a reasonable doubt of the Union's majority support." *Id.* (ALJ Decision) at 11.

The employer sent a letter on March 6, 1990 in which it formally refused to recognize and bargain with the union and indicated that "[t]he Company has reason to believe that no union has a majority support of the employees who are starting out this new fledgling business," *id.* (ALJ Decision) at 8. Two days later, the employer's

---

**3.** It was this aspect of the Board's decision that the Court of Appeals reversed. *See NLRB v.*

*Cott Corp.,* 578 F.2d 892, 895 (1st Cir.1978).

general manager met with employees and indicated that the company did not intend to recognize the union and told employees to sign a petition if they did not want the union. On April 26, certain " 'petition'-type documents" were delivered to management. The ALJ stated that the general manager "admittedly never heard anywhere near a majority of the employees express a specific wish not to be represented by the Union prior to his March 8 speech transmitting the company's refusal to bargain to the employees and inviting them to circulate 'petitions' or 'letters' manifesting antiunion sentiments." *Id.* (ALJ Decision) at 11. The ALJ recognized that under the circumstances of the case, the company's assertion of doubt about the union's majority status was "pure bluff," unlawfully intended to delay recognition and undermine support.

The ALJ continued, however:

Neither, in all of the circumstances, could Respondent justify its earlier or ongoing refusal to bargain with the Union on the "petition" documents [which the general manager] began to receive after April 26, *because those petitions may be presumed to have been tainted by Respondent's previous unfair labor practices* [which included direct solicitation of employees to sign antiunion petitions as well as the refusal to recognize], and therefore they did not reliably show where the employees' uncoerced sympathies might lie; much less could they be relied upon as evidence of how employees felt about the Union at the time Respondent initially refused to bargain, which all cases make clear is the proper temporal focus.

*Id.* (ALJ Decision) at 11–12 (emphasis added) (footnote omitted in which ALJ quoted passage from *Bay Area Mack* discussed above).

In *Bay Area Mack*, supervisors approached employees to solicit other employees to sign the antiunion petition; in *Manna Pro Partners*, employer representatives informed prospective employees that they would not be represented by the union, announced to current employees that the union would not be recognized, and, thereafter, solicited antiunion petitions. Under these circumstances, the refusal to recognize and bargain may well have affected the employees' morale, organizational activities, and union membership. Both cases involved factual situations that provided the Board with alternative explanations for the unreliability of the employee petitions above and beyond the refusal to bargain with an incumbent union. It is thus impossible, on the basis of these cases alone, to conclude that a *per se* taint rule has definitively been adopted, let alone justified and explained, by the Board.[4]

Our analysis of the Board's cases leads us to the conclusion that the Board has never announced a position that, in the successorship context, an unlawful refusal to bargain will, *per se*, taint a subsequent antiunion petition. Consequently, we remand to the Board to explain whether it has any such *per se* rule, and if so, its reasons therefor. If the Board in fact has no such rule, it must support by substantial evidence its conclusion that New Sullivan's refusal to recognize the Union under the facts of this case had a meaningful impact on employee support for the union and thereby tainted the petition.

---

**4.** In contrast to these cases, New Sullivan acknowledged an obligation to recognize and bargain with the union as soon as it reached a substantial and representative complement of employees, which it predicted would be in early October, and at which time it actually recognized the Union. It is true that New Sullivan's recognition of the Union lasted for only a day or two, but there is still a significant difference between a petition signed in the context of a persistent refusal to recognize and one signed *after* the employer has recognized the union. In the first case, it may be reasonable to infer

that the failure to recognize is the predominant factor in causing employee disaffection; in the second case, the inference that the employees do not want a union and waited to express this view until the moment the union was in fact recognized may be as reasonable as the inference that the delay in recognition undermined union support to the extent that it could not be cured by the intervening recognition. We have found nothing in this record to suggest that the employer solicited the petition or affirmatively acted unlawfully to affect the employees' attitude toward the Union.

## D. *The Remedy*

■ Because we believe that substantial evidence supports the Board's conclusion that New Sullivan committed an unfair labor practice in refusing to recognize and to bargain with the Union, we shall enforce the Board's cease and desist order. However, the Board has not explained why an affirmative bargaining order—with its corresponding decertification bar [5]—is the appropriate remedy in this case. In *Peoples Gas*, we said that before we will enforce a bargaining order, we

> must be able to determine from the Board's opinion (1) that it gave due consideration to the employees' section 7 rights, which are, after all, one of the fundamental purposes of the Act, (2) why it concluded that other purposes must override the rights of the employees to choose their bargaining representatives and (3) why other remedies, less destructive to employees' rights, are not adequate.

*Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 46 (D.C.Cir.1980). In *Peoples Gas*, the

employer's withdrawal of union recognition was found to be an unfair labor practice. While the withdrawal of recognition remained "unremedied," an election was held, and the union was defeated. The Board nonetheless ordered that the employer bargain with the union, because it believed that the "clearly appropriate" remedy for any refusal to bargain was a bargaining order.

The court, however, refused to enforce the bargaining order on the grounds that the Board failed to give due consideration to the employees' section 7 rights in deciding that a bargaining order was the appropriate remedy in every case. The court stated that the Board's "orders must reflect a responsible exercise of discretion and clearly articulate the basis for its decision." *Id.* at 45.[6]

Recently, in *St. Agnes Medical Center v. NLRB*, 871 F.2d 137 (D.C.Cir.1989), we once again emphasized that a bargaining order is an extreme remedy that is appropriate only if a fair election cannot be held, *id.* at 147.[7] We remanded the case back to

---

5. The decertification bar would last for a "reasonable period"—at least six months, perhaps as much as one year—during which time the employer and the union would presumably bargain. If a collective-bargaining agreement were reached during this period, the decertification period would be extended, by virtue of the contract bar, for an additional three years. At no time during this period would the employees be able to challenge the union's majority status. *See Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 45 n. 17 (D.C.Cir.1980).

Our dissenting colleague objects to the distinction drawn by *Williams Enterprises v. NLRB*, 956 F.2d 1226, 1237–38 (D.C.Cir.1992), between an order to cease and desist from refusing to bargain and an order affirmatively to bargain. *See* Dissent Op. at 910. The Board has, however, recognized many times that an affirmative bargaining order carries with it a decertification bar for a "reasonable period." *See, e.g., Masada Communications, Ltd. d/b/a Premier Cablevision*, 293 N.L.R.B. 931, 933 (1989) (Cracraft, concurring); *New York Patient Aids Inc. d/b/a Guardian Ambulance Serv.*, 228 N.L.R.B. 1127, 1132 (1977). And the distinction is one to which the Supreme Court has alluded. *See, e.g., Gissel*, 395 U.S. at 615, 89 S.Ct. at 1940 (discussing category of "minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order"); *International Ladies Garment Workers' Union v. NLRB*, 366 U.S. 731,

740, 81 S.Ct. 1603, 1608, 6 L.Ed.2d 762 (1961) (Board found that employer erred in extending recognition to minority union; this violation of § 8(a)(2) subjects employer "only to a remedial order requiring him to conform his conduct to the norms set out in the Act.... No further penalty results."). If the Board does not intend any such distinction between the two forms of order, in the context of a successor's refusal to bargain, then it should make that clear on remand in *Williams* and in this case.

6. It is true that *Peoples Gas* concerned an election—as opposed to a mere petition—but that difference is relevant only to the extent that a petition is a less reliable indicator of employee sentiment. As the court stated, "[t]hese general principles are particularly important in cases like this one, involving bargaining orders issued where there is a substantial possibility that in fact the employees do not desire representation by the Union." *Peoples Gas*, 629 F.2d at 46.

7. We relied on *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), in which the Supreme Court stated that a bargaining order was appropriate only in those cases where "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and ... employee sentiment ... [would] be better protected by a bar-

the Board for reconsideration of the appropriateness of a bargaining order even though there was substantial evidence that the old election should be set aside. We also required an explanation of why "the employees' section 7 rights are best protected by denying them the opportunity to vote on the issue of representation." *Id.* at 148.

Still more recently, in *Avecor, Inc. v. NLRB*, 931 F.2d 924, 934 (D.C.Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992), we again remanded to the Board to "undertake the proper inquiries and make the requisite findings before imposing the bargaining order." *Id.* at 927. In *Avecor*, the ALJ had found that the employer's conduct in threatening, interrogating, promising, and discharging certain employees prior to the election constituted unfair labor practices. The union lost the election, but the ALJ concluded that the results had been tainted. The Board issued a bargaining order offering only " 'conclusory statements that a fair rerun election [could not] be held.' " *Id.* at 938 (quoting *St. Agnes*, 871 F.2d at 148). Relying once again on *Gissel*, we recognized that a bargaining order may issue in exceptional cases marked by "outrageous

and pervasive unfair labor practices" or in less extraordinary cases marked by less pervasive practices which "nonetheless still have the tendency to undermine majority strength and impede the election process." *Gissel*, 395 U.S. at 613–14, 89 S.Ct. at 1940; *see Avecor*, 931 F.2d at 934. But

> [t]he need for a real demonstration of the inadequacy of alternative remedies is particularly acute, of course, in a case such as the present one, where the Board relies on a weakly supported inference for its belief that the unfair labor practices undermined the election that immediately followed them.

*Id.* at 938.[8]

The requirement for a reasoned explanation is not limited to cases where the union has never been recognized and so does not enjoy a presumption of majority status.[9] Indeed, *Peoples Gas*, in which the court first articulated the requirement for a reasoned explanation, was a withdrawal-of-recognition case.[10]

Although we do not preclude the possibility that the Board may be able to justify its decision to issue a bargaining order on the basis of the failure to bargain in a succes-

---

gaining order." *Id.* at 614–15, 89 S.Ct. at 1940; *see St. Agnes*, 871 F.2d at 147.

**8.** In *Williams Enterprises v. NLRB*, 956 F.2d 1226 (D.C.Cir.1992), we recently confronted a similar issue of a bargaining order imposed without explanation after a successor employer unlawfully refused to bargain with an incumbent union. Citing *Gissel*, *Avecor*, and *Peoples Gas*, we remanded to the Board for a reasoned explanation of its decision to order the parties to bargain in light of the competing interests of employees, the union, and the employer. *See id.* at 1240 ("[I]f the Board should decide to issue such an order, it must provide a reasoned explanation of why Williams's unfair labor practices are of 'such a nature that their coercive effects cannot be eliminated by the application of traditional remedies.' ") (Buckley, J., concurring) (citing *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940).

**9.** We note that the Fifth Circuit recently relied on *Peoples Gas* to justify denying enforcement to a Board's bargaining order in a successorship context. In *Texas Petrochemicals Corp. v. NLRB*, 923 F.2d 398 (5th Cir.1991), the court concluded that the successor employer committed an unfair labor practice in conducting a poll of its employees without notifying the incum-

bent union and after it had acknowledged its duty to bargain with the union. Nonetheless, the court recognized the fact that the Board took four years to issue its final order after the ALJ's initial decision. After quoting extensively from the *Peoples Gas* admonition as to the relevance of the conditions at the time the order takes effect, the court concluded that "under all of the facts in this record, including the Board's lengthy delay, were we to enforce this bargaining order without ascertaining the employees' present desires, it would be tantamount to ignoring their statutory rights." *Id.* at 406. The court stayed enforcement of the bargaining order pending the final results of a decertification election.

**10.** This court's decision in *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295 (D.C.Cir.1988), is not to the contrary. *Creative Food Design* stands only for the proposition that employee turnover in a non-*Gissel* context need not be taken into account by the Board when deciding whether to issue a bargaining order. The court never suggested that the Board was free to issue bargaining orders without any explanation whatsoever. Employee turnover is simply one factor that the Board need not consider.

sorship context alone, we ask that it explain its reasons.[11] If the Board concludes on remand that a successor's failure to bargain has the inevitable effect of distorting employees' attitudes so that a union must always be entitled to a "reasonable period" in which to bargain, before a decertification is permitted, the Board is free to articulate its reasons for such a rule.[12]

### III. CONCLUSION

For the reasons stated above, the petitions for review and for enforcement are both granted in part and denied in part. New Sullivan's petition for review is denied insofar as it seeks to overturn the Board's conclusion that the failure to recognize the Union as of August 10, 1988 was an unfair labor practice in violation of subsections 8(a)(1) and (5) of the Act. The Board's petition to enforce its cease and desist order is granted.

New Sullivan's petition to review the Board's conclusion that the withdrawal of union recognition on October 6, 1988 was an unfair labor practice is granted in part. The Board's petition to enforce its bargaining order is denied, and the order is vacated. The case is remanded to the Board for further proceedings consistent with this opinion.

*It is so ordered.*

SILBERMAN, Circuit Judge, concurring in part and dissenting in part:

I agree that substantial evidence supports the Board's determination that New

---

**11.** Our dissenting colleague surprisingly suggests that our call for a Board explanation of what it is doing in successorship refusal-to-bargain cases falls afoul of *Chevron's* call for deference. In no way are we trying to "second guess the policy decisions implicit in the Board's choices." Dissent Op. at 909. Rather, we are merely striving to identify those policy decisions. We find this case not unlike a recent decision remanding a licensing determination to the FCC for an adequate explanation of why it has adhered to its longstanding ownership/management integration rule. *See Bechtel v. FCC,* 957 F.2d 873, 881 (D.C.Cir.1992) ("[T]he Commission must demonstrate why its focus on integration is still in the public interest, if indeed the Commission concludes that it is.... [T]he Commission must nonetheless be prepared to explain and justify general policies not embodied in a regulation when they are properly challenged in a specific case.") (Silberman, J.).

Our colleague's reference to the dissent in *Conair Corp. v. NLRB,* 721 F.2d 1355 (D.C.Cir. 1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984), Dissent Op. at 909 n. 4, is puzzling. In *Conair,* the Board, in marked contrast to this case, had specifically found that no other remedy could "dissipate the lingering effects of [Conair's] massive and unrelenting coercive conduct" which "ha[d] foreclosed any possibility of holding a fair representation election." *Conair,* 721 F.2d at 1387 (Wald, J., dissenting) (quoting *Conair Corp.,* 261 N.L.R.B. 1189, 1193 (1982)). Had the Board made a similar finding here, we would have a different case.

**12.** Noting our dissenting colleague's contrary but groundless suggestions, we emphasize that we harbor no disagreement with the Board's policy choices. We ask only for a clear statement of what those choices and the reasons for them are. *See supra* at 903, 904–05. The question for us is not, as the dissent proclaims, "[C]an the Board order the employer to bargain with the union notwithstanding indications, manifested subsequent to the illegal refusal, that a majority of employees no longer wish the union to represent them?" Dissent Op. at 906. Rather, the issue is, "Must the Board explain why, under the particular facts of this case, the employee petition disavowing the Union is tainted and why it is issuing a bargaining order?" Until the Board explains itself, we have no way of reviewing the Board's actions for consistency or rationality and no way of keeping our own precedents in harmony.

Our colleague's assertion to the effect that the employer's anti-union statements in *Bay Area Mack* were "inconsequential" to the Board's determination is a prime example of the "war of inferences" that the Board's silence on these critical matters has triggered. *See* Dissent Op. at 908. We point out that the Board's bareboned comment in *Bay Area Mack* that the refusal to bargain "in itself" tainted the petition was itself dicta and fell far short of either announcing a rule or providing an explanation for its conclusion. In this case, moreover, the Board relies dispositively on a one-sentence conclusory statement of a similar relationship between the refusal to bargain and the taint of the petition. Our colleague states that "[o]f course, no basis for doubt [about the Union's majority status] exists here; the only 'evidence' that New Sullivan's employees no longer want union representation is a petition that the Board has held to be irrelevant." *Id.* at 909. To ask the question, for our colleague, is to answer it. We, on the other hand, would like the Board's answer as to why the petition is "irrelevant," and all we ask today is that such an answer be provided.

Sullivan committed an unfair labor practice when it refused to bargain with the union in August. But the second issue in this case can be analyzed a good deal more manageably than does the majority, and once that is done, I think our reviewing role is more modest than my colleagues assume. The question presented under the National Labor Relations Act, 29 U.S.C. §§ 151–169 (NLRA), is, at its core, rather straightforward: if a successor employer refuses to recognize and bargain with an incumbent union in violation of section 8(a)(5), *id.* § 158(a)(5), can the Board order the employer to bargain with the union notwithstanding indications, manifested subsequent to the illegal refusal, that a majority of employees no longer wish the union to represent them? As the majority recognizes, this is a remedial issue. We recently observed *en banc* that:

> When a federal court of appeals reviews an administrative agency's choice of remedies to correct a violation of a law the agency is charged with enforcing, the scope of judicial review is particularly narrow. Almost fifty years ago the Supreme Court, in reviewing a National Labor Relations Board remedial choice, explained why:
>
>> Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy.

*National Treasury Employees Union v. FLRA,* 910 F.2d 964, 966–67 (D.C.Cir.1990) (en banc) (quoting *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 194, 61 S.Ct. 845, 852, 85 L.Ed. 1271, (1941)); *accord NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969) ("In fashioning its remedies under the [NLRA], the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.").

It is fair to contend that the Board has not explained, as clearly as it could, its position on the issue—at least as it is presented in this case—although the Board is not required to distinguish other cases that are inapposite. I feel obliged to dissent, however, because I think the Board's path is discernible, *see Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), and, more important, because the majority opinion appears to question the Board's remedial judgment.

I see no reason why the Board may not decide, as it did here, that a successor employer's illegal refusal to recognize and bargain with a union necessarily taints a subsequent employee petition expressing dissatisfaction with the union and that the employer, therefore, may not use the petition to defend against a bargaining order. By so doing, the Board simply puts all parties, including the employees, back in the position in which they would have found themselves had the employer not violated the law. This is not an inevitable remedial choice, but it is hardly an irrational or unorthodox one. The traditional remedy for a section 8(a)(5) violation is an order to cease and desist from refusing to bargain and affirmatively to bargain with the union, *see* C. MORRIS, THE DEVELOPING LABOR LAW 1663 (2d ed. 1983); the Board imposed just this remedy in every successor employer case cited by the majority. *See Manna Pro Partners, L.P.,* 364 N.L.R.B. No. 104, at 16–17 (1991); *Transportation Equip. Servs., Inc. d/b/a/ Bay Area Mack,* 323 N.L.R.B. 125, 134–35 (1989) (*Bay Area Mack*); *Western Distrib. Co. d/b/a Western–Davis Co.,* 236 N.L.R.B. 1224, 1227 (1978), *enforcement denied on other grounds,* 608 F.2d 397 (10th Cir.1979); *First Food Ventures, Inc.,* 229 N.L.R.B. 1228, 1231 (1977); *Ponn Distrib., Inc.,* 223 N.L.R.B. 312, 316 (1977), *enforcement denied on other grounds sub nom. NLRB v. Cott Corp.,* 578 F.2d 892 (1st Cir.1978). *But cf. Williams Enters. v. NLRB,* 956 F.2d 1226, 1235 (D.C.Cir.1992) ("[W]e find no Board decision declaring that a bargaining order is the standard remedy in the successorship context let alone explaining and justifying the basis for such a rule.").

The majority's lengthy discussion of the significance of New Sullivan's fleeting recognition of the union in October, followed virtually immediately by the employee petition and New Sullivan's *volte-face, see* Maj. Op. at 897–903, seems to me a diversion. Whether or not the employer's October behavior indicated a pure heart or was in fact a clever ruse is largely beside the point. The case would present the same remedial issue vis-à-vis the August refusal to bargain if the employee petition had been presented in October without any intervening action one way or the other by New Sullivan. That appears to be the way the ALJ (and the Board, which adopted the ALJ's conclusions) saw it:

> [By] withholding union recognition until October ..., the Respondent improperly undermined the union's majority status thereby tainting the employee petition. As the Respondent was not at liberty to rely on that tainted petition, I find that its [October] withdrawal of recognition was violative of Section 8(a)(5) as alleged.

*Sullivan Indus., Inc.,* 302 N.L.R.B. No. 23, at 12–13 (1991). The majority believes there is a "significant difference" between a petition filed in the face of a continuing refusal to recognize and one filed hours after the employer changes its mind and extends recognition; in the former case, the majority supposes, the employees do not want the union because of the employer's attitude, whereas in the latter, the employees *really* do not want the union. Maj. Op. at 902 n. 4. I would have thought we would leave such nice appraisals of employee motivation to the agency whose expertise Congress commissioned.[1]

The majority also discusses several Board and court cases that explore the circumstances under which an employer who commits various unfair labor practices *other* than a refusal to bargain may still claim a good faith doubt as to a union's majority status and therefore lawfully refuse to bargain with the union. *See, e.g., Master Slack Corp.,* 271 N.L.R.B. 78, 84 (1984); *Olson Bodies, Inc.,* 206 N.L.R.B.

779, 784–85 (1973); *see also St. Agnes Medical Center v. NLRB,* 871 F.2d 137, 145–47 (D.C.Cir.1989) (remanding for determination whether an employer's unfair labor practices tainted a subsequent election in which employees voted to decertify the union). These decisions are really not in point. In this case the Board determined, and we affirm, that New Sullivan illegally refused to recognize and bargain with the union in August. That sort of conduct could be thought inevitably to undermine the union's status so as to taint a subsequent petition manifesting employee dissatisfaction with the union. Under these circumstances, therefore, it is quite open to the Board to hold that, as a matter of remedial law, it simply will not consider the petition as relevant, because it is difficult to imagine how the employer's illegal refusal to recognize the union would *not* undermine the union's status in the eyes of the employees. As we have recently observed with respect to violations of section 8(a)(3), 29 U.S.C. § 158(a)(3) (which makes discrimination on the basis of union membership unlawful), "[s]ome conduct speaks for itself." *Teamsters Local Union Nos. 822 & 592 v. NLRB,* 956 F.2d 317, 319 (D.C.Cir.1992).

The Board has made the point in several decisions that the majority takes considerable pains to distinguish. For example, *Bay Area Mack,* citing *Master Slack*—the case that, according to the majority, together with *Olson Bodies* sets forth the factors the Board considers when deciding whether an employer's unfair labor practices caused employees' dissatisfaction with the union— quite categorically states:

> Any "objective considerations" relied on by an employer to ground a good-faith refusal to recognize an incumbent union must themselves arise in a context free of any unfair labor practices which might meaningfully tend to cause employees to become disaffected with the incumbent union. *See, e.g., Master Slack Corp.,* 271 NLRB 78, 84 (1984). A successor-

---

**1.** If I were permitted to draw upon my own experience, I would suggest that an employee's perception of the desirability of a union is never

unaffected by his or her appraisal of the employer's view.

employer's refusal to honor a proper union recognitional demand will be deemed, in itself, an unlawful act which fatally taints a later antiunion petition from employees which might otherwise support a claim of good-faith doubt about the union's majority status.

*Id.* at 131 (additional citation omitted); *accord Manna Pro Partners,* 304 N.L.R.B. at 11–12; *see also Ponn,* 232 N.L.R.B. at 315 & n. 11 (quoting *Olson Bodies* to support a conclusion that, where the predecessor employer unlawfully refused to bargain with the union, a successor could not rely on an employee decertification petition to justify not bargaining with the union); *First Food Ventures,* 229 N.L.R.B. at 1230 n. 12 (stating that a successor employer's reliance on an employee petition "is vitiated by its preexisting unlawful refusal to bargain and, accordingly, is entitled to no weight"). That the employer in *Bay Area Mack* "not only failed to recognize the union but maintained throughout the period that [it] would never bargain with the union," Maj.Op. at 901, and committed unfair labor practices in addition to the refusal to bargain, *see id.* at 902–03, was inconsequential to the Board's determination: the decision unequivocally says that a refusal to bargain *"in itself* ... fatally taints a later antiunion petition from employees" (emphasis added).

Indeed, this very proposition has been recognized by the Supreme Court. In *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987), the Court observed that a successor employer's refusal to bargain with the existing union " 'disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.' " *Id.* at 49–50, 107 S.Ct. at 2239 (quoting *Franks Bros. Co. v. NLRB,* 321 U.S. 702, 704, 64 S.Ct. 817, 818, 88 L.Ed. 1020 (1944)). It also said:

"[O]nce it has been determined that an employer has unlawfully withheld recognition of an employees' bargaining representative, the employer cannot defend against a remedial bargaining by point-

ing to an intervening loss of employee support for the union when such loss of support is a foreseeable consequence of the employer's unfair labor practice."

*Id.* 482 U.S. at 51 n. 18, 107 S.Ct. at 2240 n. 18 (quoting *NLRB v. Fall River Dyeing & Finishing Corp.,* 775 F.2d 425, 433 (1st Cir.1985)). I think it sufficiently clear that the Board, in its discretion, has reasonably concluded that loss of employee support for a union is a "foreseeable consequence" of a successor employer's illegal refusal to bargain.

The majority, nevertheless, suggests (but does not hold) that unless the Board were to determine that New Sullivan had in some way fomented the employees' petition other than by illegally refusing to recognize the union in August, the Board faces some analytical difficulty in applying what the majority refers to as a *"per se* rule." That is apparently why my colleagues are unwilling to accept the Board's terse reasoning at face value. The source of the majority's concern seems to be a 1980 decision of this court, *Peoples Gas System, Inc. v. NLRB,* 629 F.2d 35 (D.C.Cir.1980). *Peoples Gas* does not control this case, however, because, as the majority recognizes, *see* Maj. Op. at 903 n. 6, the intervening event between the unlawful refusal to bargain and the Board's remedial order in that case was a Board *election* in which the employees rejected the union. These unusual circumstances occurred because the Board dismissed the unfair labor practice charge—which otherwise would have blocked the election, *see Peoples Gas,* 629 F.2d at 39 n. 5—and reversed itself post-election following a remand from this court. *See id.* at 40–41. The decision was expressly limited to the "singular factual situation," *NLRB v. Creative Food Design Ltd.,* 852 F.2d 1295, 1303 (D.C.Cir.1988), presented. *See Peoples Gas,* 629 F.2d at 50 ("If *any* of these facts were altered, we would be more willing to defer to the Board...." (emphasis added)).

Although *Peoples Gas* is distinguishable,[2] the majority is justified in believing

---

**2.** As the majority acknowledges, *see* Maj.Op. at

903 n. 6, a formal secret ballot election under

that the logic of that case supports the approach it takes here. *Peoples Gas* expressed discomfort with the Board's view that a bargaining order was an appropriate remedy for an unlawful refusal to bargain notwithstanding a subsequent indication of employee dissatisfaction with the union. We thought that, in light of the decertification election, which was a "clear, uncoerced" statement of employees' views, *id.* at 48, the Board had shown too little concern for the employees' section 7 right, *see* 29 U.S.C. § 157, not to join a union. *See Peoples Gas*, 629 F.2d at 45–51. But we have since made clear that our decision rested on the "explicit and definitive expression of employee preference" that the election represented, *Creative Food Design*, 852 F.2d at 1303, and accordingly have declined to apply *Peoples Gas* when "there is no reason why the Board should doubt the union's support." *Id.* at 1304. Of course, no basis for doubt exists here; the only "evidence" that New Sullivan's employees no longer want union representation is a petition that the Board has held to be irrelevant.

I would not extend *Peoples Gas* to this case for another reason: I think it is in tension with subsequent governing legal developments. Since 1980, the Supreme Court and this court have developed a body of law, *see, e.g., Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), that calls for greater deference than used to be given to agency interpretation of general or imprecise statutory terms;[3] and, as noted above, an agency's choice of

remedy receives the greatest deference. We are not permitted to second guess the policy decisions implicit in the Board's choices. A careful reading of *Peoples Gas* reveals just that sort of excessive judicial review. By relying so heavily on *Peoples Gas* and by emphasizing the importance of the employee petition, the court comes perilously close to suggesting to the Board that it has not struck the appropriate balance between the interests of unions and the right of employees to engage in collective bargaining, on one hand, and employees' right not to unionize, on the other. The majority seems to object to the Board's order because, in its view, the employer's conduct is really not *so* objectionable; it might be thought only a minor unfair labor practice. *See* Maj.Op. at 903 n. 5 (quoting *Gissel* for the proposition that "minor or less extensive unfair labor practices ... will not sustain a bargaining order"). If so, this would not be any longer (if it ever was) a legitimate exercise of judicial review of the Board's remedial orders.[4]

To be sure, in *Gissel* the Supreme Court said that any and all unfair labor practices will not automatically justify the issuance of a bargaining order, *see* 395 U.S. at 613–15, 89 S.Ct. at 1939–41, and this Court has required explanation of Board bargaining orders used to remedy employers' unfair labor practices *other than a refusal to bargain* when those practices have tainted a union election and made a fair rerun election impossible. *See, e.g., Avecor, Inc. v. NLRB*, 931 F.2d 924, 932–39 (D.C.Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 912, 116 L.Ed.2d 812 (1992); *St. Agnes*

---

Board auspices is a more reliable indicator of employee sentiment than is an employee petition.

3. The remedial provision involved in this case is quite general. Section 10(c) of the NLRA broadly states that when the Board finds that a person has committed an unfair labor practice, the Board "shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of [the Act.]" 29 U.S.C. § 160(c).

4. I am reminded of a similar controversy in *Conair Corp. v. NLRB*, 721 F.2d 1355 (D.C.Cir. 1983), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984), in which the majority rejected a Board bargaining order designed to remedy concededly "outrageous" and "pervasive" unfair labor practices because the union had never demonstrated majority support. *Id.* at 1377–84. The dissent, arguing that the bargaining order should be enforced, criticized the majority for "usurp[ing] for themselves a mighty responsibility in emasculating the Board's remedial authority in extreme cases to fulfill its Congressional mandate to 'effectuate the policies of the Act.'" *Id.* at 1388 (Wald, J., dissenting).

*Medical Center*, 871 F.2d at 142–49. But the problem raised in those cases is different in kind from the one presented by our case (or *Peoples Gas*). This is so because "[t]he normal cure for an unfair election is a fair election," *Avecor*, 931 F.2d at 935, and bargaining orders in *Gissel*-type cases are thus extraordinary remedies requiring special justification. The classic remedy for a refusal to bargain, however, *is* a bargaining order; there is thus no apparent reason to force the Board to further explain its choice.

I therefore disagree with the course adopted by the Fifth Circuit in *Texas Petrochemicals Corp. v. NLRB*, 923 F.2d 398 (5th Cir.1991), which, on the authority of *Peoples Gas*, stayed the Board's bargaining order and called for an election, *see id.* at 405–06—a result that afforded the Board even less deference than does the majority's decision here. For similar reasons, I cannot accept the distinction drawn by the majority, *see* Maj.Op. at 903, and by a different panel in *Williams*, 956 F.2d 1226, 1237–38 between an order directing a successor employer to cease and desist from refusing to bargain and an order requiring the employer affirmatively to bargain. *Williams* says that the latter carries a decertification bar, while the former does not, and that a cease-and-desist order without a decertification bar is the "proper" remedy for a successor employer's refusal to bargain. *Id.* at 1238. The Board, as I have said, regularly imposes the two remedies together when a successor employer unlawfully refuses to recognize an incumbent union, and, given our limited reviewing role, I cannot imagine that it is appropriate for us to sever them. To suggest that only a cease-and-desist order is appropriate is to imply necessarily that the employees should be able to get rid of the union more readily, and I think that it is for the Board to make that kind of judgment.

We are, of course, entitled to remand to an agency for an adequate explanation of its position so that meaningful judicial review is possible. It is important that we do so only on those occasions when we really do not perceive the rationale for agency action—not when we are merely uncomfortable with an agency's determination. It is often difficult for us to draw that line in practice, and, in any given case, a judge's conclusion that an agency's explanation is inadequate may depend a great deal on his or her view of the substantive law applied by the agency. In any event, I take considerable solace from my colleagues' assurances that they would be satisfied with a somewhat more direct and forceful explanation of the Board's position, though I would approve the one the Board has given us.